**YELLOW FREIGHT SYSTEMS, INCORPORATED, Petitioner,**

v.

**Robert B. REICH, Secretary of Labor; James R. Hornbuckle, Jr., Respondents.**

No. 93–1205.

United States Court of Appeals, Fourth Circuit.

Argued July 12, 1993.

Decided Oct. 29, 1993.

Roger Kenneth Quillen, Fisher & Phillips, Atlanta, GA, argued (Michael C. Towers, Deborah C. Craytor, Fisher & Phillips, on brief), for petitioner.

Edward Owen Falkowski, U.S. Dept. of Labor, Washington, DC, argued (Judith E. Kramer, Deputy Sol. of Labor, Joseph M. Woodward, Associate Sol. for Occupational Safety and Health; Ann Rosenthal, for Appellate Litigation, Barbara A.W. McConnell, U.S. Dept. of Labor, Washington, DC, on brief), for respondents.

Before WILKINSON, WILKINS and NIEMEYER, Circuit Judges.

## OPINION

WILKINSON, Circuit Judge:

The question presented is whether the Secretary of Labor properly found that Yellow Freight System, Inc. ("YFS") had disciplined a driver in violation of the Surface Transportation Assistance Act ("STAA" or the "Act"). 49 U.S.C. app. §§ 2301–2305. We affirm the Secretary's ruling that Yellow Freight impermissibly disciplined this driver for declining to operate a commercial motor vehicle while in a severely fatigued state.

## I.

### A.

James R. Hornbuckle, Jr. has been a long haul driver for Yellow Freight since March 1984. He drove out of the company's terminal in Charlotte, North Carolina. In April 1991, Hornbuckle filed a complaint with the Secretary alleging that YFS had disciplined him for refusing to operate a commercial vehicle when he was severely fatigued. Specifically, on April 8–9, 1991, Hornbuckle had driven freight from Charlotte to Jacksonville, Florida. On any given trip, Yellow Freight expects its drivers to complete their runs within a time equalling the sum of (1) one-half hour for pre-trip inspection; (2) an established "running time" between freight terminals, negotiated by YFS and Local Union No. 71 of the International Brotherhood of Teamsters, the drivers' union; (3) a one-hour meal break en route; and (4) a one-hour grace period. With an established running time between Charlotte and Jacksonville of eight hours, plus the allotted meal break and grace period, Yellow Freight anticipated Hornbuckle's arrival in Jacksonville ten hours after his departure from Charlotte. Hornbuckle took eleven hours to make the trip. This delay was attributed to Hornbuckle's pulling into a truck stop and taking a nap "across the steering wheel" between approximately 12:30 a.m. and 2:00 a.m. Hornbuckle pulled over to take the nap after he noticed himself "crossing the line" while driving and other drivers told him he was weaving on the road.

On April 11, 1991, Yellow Freight's Linehaul Operations Manager in Charlotte, Ted Sowers, wrote Hornbuckle a "Letter of Information" telling him that "[o]n April 9, 1991 you delayed freight and equipment. Subsequent occurrences of the above offense will result in more serious disciplinary action." Sowers declined Hornbuckle's April 15 request to remove the letter from his file.

On April 12, 1991, Hornbuckle accepted a dispatch from Charlotte to Nashville, Tennessee, with a negotiated running time of nine hours. Due to oversleeping, Hornbuckle arrived at the Charlotte terminal forty-five minutes late, but completed his pre-trip in-spection in one-half hour, drove for a total of nine hours, took a one-hour meal break, and took an additional one-half hour coffee break. The additional break came in Crossville, Tennessee, after Hornbuckle had negotiated especially heavy traffic amid construction work in Knoxville. With Yellow Freight's one-hour grace period, Hornbuckle arrived in Nashville fifteen minutes later than the company expected.

On April 13, 1991, Hornbuckle made a return run from Nashville to Charlotte. He again spent one-half hour on pre-trip inspection, drove for a total of nine hours, and took a one-hour meal break. Hornbuckle also took an additional one-hour break, for what he called "safety" reasons, while driving through adverse weather and traffic conditions, including rain, fog, and a wreck involving two other tractor trailers and a car near Black Mountain, North Carolina. With the one-hour grace period, he arrived in the Charlotte terminal when the company expected. Hornbuckle then spent an additional eighteen minutes situating his truck, removing his personal belongings from the cab, and taking his freight bills to the dispatcher. This eighteen-minute span occurred beyond the grace period.

On April 16, 1991, Sowers wrote Hornbuckle a "Letter of Warning" for "Delay of freight on April 12, 1991," noting that "[s]ubsequent occurrences of the above offense could result in further disciplinary action." Also on April 16, Sowers wrote Hornbuckle (1) advising him of the previous letters, (2) stating that "[a]gain on April 13, 1991 you delayed freight and equipment," and (3) suspending him from work for three days.

### B.

Hornbuckle filed complaints regarding all three letters of discipline with the Department of Labor, as provided by regulations promulgated under the STAA. *See* 29 C.F.R. § 1978.102. Hornbuckle alleged that Yellow Freight's suspension decision violated the STAA because it punished his refusal to drive in violation of a Department of Transportation regulation prohibiting drivers from operating a vehicle while fatigued. *See* 49 C.F.R. § 392.3.

The matter was first heard before an administrative law judge ("ALJ"). *See* 29 C.F.R. § 1978.106. The basic Title VII proof scheme governs actions under the STAA. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The ALJ concluded that Hornbuckle had established a prima facie violation because (1) taking the fatigue break on April 9 was protected activity under the Act; (2) YFS was aware that Hornbuckle took such breaks; and (3) the letter of information was adverse action on the part of Yellow Freight resulting from the protected activity. The ALJ then found that YFS had rebutted this prima facie showing with evidence of nondiscriminatory reasons for disciplining Hornbuckle—namely that Hornbuckle had not availed himself of company procedures designed to help drivers get adequate rest between runs and had delayed freight on the runs between Charlotte and Nashville by oversleeping, taking extra breaks en route, and taking too much time to check in once back in Charlotte. According to the ALJ, Yellow Freight had "established a pattern of delay of freight by" Hornbuckle, and Hornbuckle had offered only speculative assertions that the discipline was "really given in retaliation of his legitimate need for a fatigue break on April 9, 1991." Accordingly, the ALJ recommended that Hornbuckle's complaint be denied.

The Secretary overturned the ALJ's ruling. First, the Secretary rejected as unsupported by substantial evidence the ALJ's factual finding that YFS had established a pattern of freight delay by Hornbuckle. The Secretary then expanded upon the ALJ's conclusion that Hornbuckle had made out a prima facie case by stressing that the driver had engaged in protected activity both "when he ceased driving for an hour and a half in order to sleep" and when he complained "to

Sowers about the letter of information and [directed] that it be removed from his file."

Primarily, the Secretary disagreed with the ALJ's legal conclusion that YFS provided a legitimate, nondiscriminatory reason for issuing the letter of information. The Secretary concluded that Hornbuckle's need to rest during the Jacksonville run occurred not because Hornbuckle failed to avail himself of certain company procedures, but because he received a dispatch and departed Charlotte later than he or YFS anticipated. Specifically, during the day of April 8, YFS dispatchers had repeatedly told Hornbuckle that a dispatch for him was imminent on April 8. Then, after finally receiving the dispatch, Hornbuckle arrived at the terminal and discovered that his truck required a repair prior to departure. In this situation, the Secretary concluded that Yellow Freight's policies offered Hornbuckle "no real measure of protection against discipline" when he needed to take a nap during his run on April 8–9 and that "in the particular circumstances of this case, ... [Hornbuckle] did not forfeit STAA protection by accepting the assignment on April 8." Finally, although he found the question to be close, the Secretary ruled that YFS had issued the letters of warning and suspension in retaliation for the fatigue break and Hornbuckle's complaints about the letter of information.

In sum, the Secretary concluded that Yellow Freight had violated the STAA in disciplining Hornbuckle. Accordingly, the Secretary ordered YFS to "expunge from Complainant's employment file(s)" all three letters and to "compensate Complainant for any lost wages, terms, conditions, and privileges of employment."

■ This appeal followed. *See* 49 U.S.C. app. § 2305(d)(1).[1]

---

1. Hornbuckle also sought relief from his suspension through contractual grievance procedures. An arbitration panel reduced the company's sanction to a one-day suspension. While the regulations grant the ALJ discretion to defer to such proceedings, 29 C.F.R. § 1978.112, the ALJ did not defer here because the arbitration panel's five-word decision did not adequately show that "the outcome of the proceedings was not repug- nant to the purpose and policy of the Act," *id.* § 1978.112(c), nor did it indicate that evidence of all of the issues before the ALJ had been before the panel, *id.* The Secretary affirmed the ALJ on this point. We agree with the Secretary that the ALJ permissibly interpreted § 1978.112 in declining to defer to the arbitral decision. *See Roadway Express, Inc. v. Brock*, 830 F.2d 179, 182 (11th Cir.1987).

## II.

Congress passed the STAA in 1982 to combat the "increasing number of deaths, injuries, and property damage due to commercial motor vehicle accidents" on America's highways. *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 262, 107 S.Ct. 1740, 1748, 95 L.Ed.2d 239 (1987) (quoting remarks of Sen. Danforth and summary of proposed statute at 128 Cong.Rec. 32509, 32510 (1982)); *see also Lewis Grocer Co. v. Holloway*, 874 F.2d 1008, 1011 (5th Cir.1989) ("Congress enacted the STAA to promote safe interstate commerce of commercial motor vehicles.") The Act seeks to reduce unsafe driving by long haul truckers in two ways. First, it prohibits discipline of trucking employees who raise violations of commercial motor vehicle rules on the part of trucking companies. 49 U.S.C. app. § 2305(a). The Act recognizes that drivers and other employees are often in the best position to detect when an operation is not running safely, but that employees often may not report violations for fear of backlash from their employers. *See Brock*, 481 U.S. at 258, 107 S.Ct. at 1745; *Yellow Freight Sys., Inc. v. Martin*, 954 F.2d 353, 356 (6th Cir.1992); *Lewis Grocer*, 874 F.2d at 1011.

Second, the Act encourages safer driving by prohibiting discipline of drivers who refuse to operate their vehicles under dangerous or illegal conditions. Specifically, the STAA forbids employers from discriminating "in any manner" against employees who refuse "to operate a vehicle when such operation constitutes a violation of any Federal rules, regulations, standards or orders applicable to commercial motor vehicle safety," or when such operation would be "unsafe" and pose "a bona fide danger" of accident or injury. 49 U.S.C. app. § 2305(b); *see Roadway Express, Inc. v. Dole*, 929 F.2d 1060, 1065 (5th Cir.1991) (stating that § 2305(b) ensures that employees who "refuse to commit unsafe acts do not suffer adverse employment consequences because of their actions"). One such motor vehicle safety standard is the driver fatigue rule. This DOT regulation provides that

> No driver shall operate a motor vehicle, and a motor carrier shall not require or permit a driver to operate a motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue ... as to make it unsafe for him to begin or continue to operate the motor vehicle.

49 C.F.R. § 392.3; *see also Trans Fleet Enters., Inc. v. Boone*, 987 F.2d 1000, 1002 (4th Cir.1992) (linking the driver fatigue rule to the STAA).

## III.

Under the scheme established by Congress, the Secretary of Labor makes final determinations on Surface Transportation Assistance Act violations, 49 U.S.C. app. § 2305(c)(2)(A)–(B); *see also* 29 C.F.R. § 1978.109(c)(1), subject to appellate court review, 49 U.S.C. app. § 2305(d)(1); *see also* 29 C.F.R. § 1978.110. When reviewing the Secretary's determination, we are bound by his legal conclusions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *see* 49 U.S.C. app. § 2305(d)(1) (incorporating by reference 5 U.S.C. § 706(2)(A)), and by his factual findings if they are supported by substantial evidence, *id.* (incorporating by reference 5 U.S.C. § 706(2)(E)). Similarly, the Secretary must adopt the ALJ's findings of fact if they are supported by substantial evidence. 29 C.F.R. § 1978.109(c)(3). We are mindful, of course, of the deference due the Secretary's interpretation of a statute Congress charged him with administering. *See Yellow Freight Sys., Inc. v. Martin*, 954 F.2d 353, 357 (6th Cir.1992).

### A.

Yellow Freight argues that the Secretary erred in overturning its disciplinary sanctions. The company maintains it had permissible reasons for punishing Hornbuckle and argues that the Secretary exceeded his authority in ruling it could not mete out punishments to a tardy driver.

■ We think the company's position overlooks both the requirements of the STAA and the Secretary's findings in this case. The Act forbids companies from sanctioning drivers who decline to drive under dangerous or illegal conditions. Here, the

Secretary found (1) that Hornbuckle stopped his truck on April 9 for reasons of fatigue; (2) that YFS disciplined Hornbuckle on April 11 for the protected act of taking this needed fatigue break; and (3) that YFS's policies to encourage drivers to get adequate rest between runs did not protect Hornbuckle in his unique circumstances on April 8. Because substantial evidence in the record supports these findings, we may not reverse them, *Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir.1987), or the judgment the Secretary made in reliance upon them, *see Lewis Grocer Co. v. Holloway*, 874 F.2d 1008, 1011–12 (5th Cir.1989).

Substantial evidence certainly supports the finding that Hornbuckle stopped his truck at 12:30 a.m. on April 9 because of fatigue; he had been awake for nineteen and one-half hours at that point. Hornbuckle had taken a ten-hour rest prior to awakening and becoming available for dispatch at 5:00 a.m. on April 8. He did not receive his dispatch to Jacksonville, however, until just after 2:00 p.m. that day. Further delays occurred after he got the dispatch. A pre-trip inspection revealed the need for a repair to his vehicle, which took nearly an hour to complete. As a result, Hornbuckle did not depart Charlotte until 5:30 p.m., after having been up for twelve and one-half hours. Seven hours later, after beginning to weave on the road, he pulled over for a nap.

Substantial evidence also supports the finding that Yellow Freight disciplined Hornbuckle for taking this necessary nap. The letter of information issued to the driver stated only that he had "delayed freight and equipment" on April 9, 1991, the date he took the nap. The Secretary found that the delay occurred because Hornbuckle's nap caused him to exceed the established running time, and that but for the nap, Hornbuckle would not have been disciplined.

Yellow Freight maintains, however, that it had procedures in place to help drivers get adequate rest between runs, and that it sanctioned Hornbuckle not for engaging in protected acts, but because he failed to take advantage of these procedures on April 8. These procedures included (1) allowing drivers returning from a run to elect eight, ten, or twelve hours of rest before being on call for another dispatch; (2) allowing drivers to take, at any time prior to receiving a dispatch, additional rest for up to six hours, called a "slide"; (3) giving drivers two hours in which to report to work after receiving a dispatch; and (4) allowing drivers to take up to three personal days off from Monday through Wednesday in order to be rested for trips during the heavier freight days closer to the weekend.

The Secretary determined, however, that these procedures did not help a driver in Hornbuckle's situation on April 8, and substantial evidence again supports this finding. Initially, we observe that Hornbuckle availed himself of the first and third procedures: taking ten instead of the minimum eight hours rest after a run and taking two hours to report to the terminal from his home outside of Charlotte after receiving a dispatch. Hornbuckle did not elect to take the whole day off (April 8 was a Monday) or take a "slide," however, because each of the several times he telephoned YFS's dispatchers during the day, they told him that he was first or second on the ride board to be dispatched. Thus, Hornbuckle reasonably thought a dispatch to be imminent. Somewhat unusually, however, drivers more senior than Hornbuckle, who himself ranked in the top third among Charlotte drivers, continued to appear on the board and take the available rides. Hornbuckle testified that just as he began seriously to consider taking a "slide," his dispatch call came. He also testified that when he received the dispatch at 2:00 p.m., arrived at the Charlotte terminal at 4:00 p.m., and departed from Charlotte at 5:30 p.m., he did not believe he was too tired to make the trip; he only became fatigued during the drive.

 Under these circumstances, the Secretary permissibly concluded that Yellow Freight's policies did not afford Hornbuckle any real measure of protection against discipline when he needed a fatigue break on April 9 and that he did not forfeit STAA protection by accepting the assignment on April 8. The Secretary interpreted the STAA to prohibit Yellow Freight from sanctioning Hornbuckle when he refused to risk

an accident—and violate federal law—by driving while fatigued for the sake of completing a freight run that already had been held up by circumstances out of his control. As the Secretary stated, "Yellow Freight has not shown that its business interests in avoiding an hour's delay in this instance outweighed the policies underlying the STAA." Such an interpretation of the STAA is consistent with the Secretary's statutory mandate. *See Yellow Freight*, 954 F.2d at 357.

■ Similarly, substantial evidence supports the Secretary's finding that Yellow Freight issued the letters of warning and suspension in retaliation for Hornbuckle taking the fatigue break and then complaining to Manager Sowers about the letter of information. Such oral complaints are protected activity under the STAA. *See Moon*, 836 F.2d at 228. Yellow Freight maintains that Hornbuckle received the two letters because he delayed freight for fifteen minutes on the run to Nashville and somehow dawdled for eighteen minutes before checking in upon his return to Charlotte. The Secretary, however, noted the reasonableness of Hornbuckle taking some time after the April 13 run to remove personal belongings from his truck and the legitimate need of long haul drivers to carry such items. Further, the very small margins by which Hornbuckle exceeded expected times on the two trips, the extenuating circumstances of construction delays and bad weather, and the fact that the supposedly progressive disciplinary steps were taken simultaneously all suggest that the Secretary did not err in holding that Yellow Freight engaged in retaliatory action. The timing of the events also supports the Secretary's conclusion. The disciplinary actions occurred almost immediately after Hornbuckle had complained about the letter of information to Sowers. In the days prior, and even while listening to Hornbuckle's complaint, Sowers had not mentioned the brief delays on the runs between Charlotte and Nashville.

■ Yellow Freight contends generally that the Secretary failed to accept the ALJ's findings of fact as required under 29 C.F.R. § 1978.109(c)(3). We note, however, that we review only the Secretary's decision, 49 U.S.C. app. § 2305(d)(1), not the ALJ's, because Congress has entrusted the Secretary with the duty of administering the Act. The Secretary may disagree with an ALJ's conclusions and review the record independently to assess evidence not adequately considered at the hearing. *See Roadway Express*, 929 F.2d at 1066.

Our review of the Secretary's decision indicates that it finds support both in the record and in the plain mandate of the STAA.

### B.

The dissent attempts to recast this case on appeal free of its statutory burden to defer to the Secretary's findings. In particular, it ignores the Secretary's finding that no pattern of delay on Hornbuckle's part existed. The Secretary specifically stated that "substantial evidence does not support the ALJ's finding that 'Respondent has established a pattern of delay of freight by Complainant,' ... and I decline to adopt [that finding]." The Secretary reached this holding because the record indicated that two of the April episodes involved delays of no more than 15 and 18 minutes and because there were at most two or three instances when Yellow Freight managers spoke to Hornbuckle about delaying freight prior to the episodes on April 9, 12, and 13. These isolated instances did not establish a pattern of delay over Hornbuckle's nine-year career as a Yellow Freight hauler. If a pattern of delay truly existed, one would expect the company to have come forward with some documentation of it. Though Yellow Freight repeatedly alludes to a "pattern of delay," the allegations have a looseness to them, and the specifics of this supposed pattern were never presented.

Secondly, the dissent assumes that Hornbuckle took a dispatch when he knew he was tired, notwithstanding the fact that the driver's testimony was exactly the opposite. As the Secretary explained, Hornbuckle "testified that he attempted unsuccessfully to nap while awaiting dispatch and that he was not fatigued at 2:00 p.m., when called, at 4:00 p.m., when reporting, and at 5:30 p.m., when departing.... It is not clear that sliding during this period would have provided

Hornbuckle meaningful rest." The Secretary's explanation directly reflects the transcript of the hearing before the ALJ:

Q. ... Mr. Hornbuckle, were you too fatigued to drive at two o'clock on April the eighth?

A. No.

Q. Were you too fatigued to drive at four o'clock?

A. No.

Q. How about five thirty?

A. No.

Thirdly, the dissent assumes that Yellow Freight had done all it could to assure a rested state on the part of its drivers. The record, however, demonstrates that throughout the day Hornbuckle was promised a dispatch which somehow never quite seemed to materialize. As the Secretary noted, Hornbuckle "telephoned the Yellow Freight dispatchers frequently during the day and was told repeatedly that an assignment was imminent." When the dispatch finally did arrive, Hornbuckle made a decision, consistent with years of driving experience, to accept the assignment. The time lag caused by ride board logistics, and compounded by a needed repair prior to commencing the run, caught up with Hornbuckle after he began the trip. At that time, Hornbuckle exercised his statutory right not to drive his Yellow Freight truck while fatigued. The Act does not require a driver to remain awake all day awaiting dispatch and then to drive all night. In applying the Act, the Secretary was entitled to protect a trucker who chose to pull over and take a nap instead of risking catastrophe.

The dissent assumes that a driver's fatigue is something that can be perfectly forecast and that because company procedures which allegedly allay fatigue are in place, drivers will never become tired in the course of a long journey. In reality, of course, fatigue is not always predictable. Under the dissent's regime, a driver weaving on the highway would hesitate to pull over and rest because by so doing he might subject himself to sanctions. The dissent places drivers be-

tween a rock and a hard place—either drive a truck when fatigued, in violation of federal law, or pull over and risk a loss of employment.

Judge Harold Leventhal once said that using legislative history is like "looking over a crowd and picking out your friends."[2] The same point can be made when an appellate court reviews an administrative record. As a result, the standard of review is an important component of judicial restraint. Once satisfied, as we are here, that the Secretary's findings are supported by substantial evidence, this court may not accept the company's invitation to cruise through the administrative record with an eye to adopting management's version of the dispute.

## IV.

Yellow Freight's remaining arguments lack merit. The Secretary did not deny YFS administrative due process in rendering his final decision and order; he did not make a determination on any issue that the parties had not fully and fairly litigated at the administrative hearing. *See Yellow Freight*, 954 F.2d at 358. The Secretary also did not impermissibly substitute his own judgment for YFS's about how to provide ample rest opportunities for truck drivers. Yellow Freight's policies remain valid; the Secretary simply determined that given the policies behind the STAA and the particular facts of this case, Hornbuckle's acceptance of the Jacksonville dispatch did not forfeit his statutory right to discontinue driving when fatigued.

## V.

We emphasize that our holding is a narrow one. The STAA charges the Secretary with protecting the interests of driver and public safety. Nothing in this legislation authorizes the Secretary to engage in general supervision of employer disciplinary practices or to undercut the legitimate interests of a trucking company in assuring the timely delivery of freight for its customers. An employer obviously remains free to sanction

---

**2.** Quoted in Stephen Breyer, *The 1991 Justice Lester W. Roth Lecture: On the Uses of Legislative* *History in Interpreting Statutes,* 65 S.Cal.L.Rev. 845, 845–46 (1992).

an employee for chronically tardy conduct or indeed for any action not protected by the STAA. The STAA protects only a driver who may unexpectedly encounter fatigue on the course of a journey; it obviously does not protect delays unrelated to the statutory purposes of public and personal safety.

For the foregoing reasons, the Secretary's decision and order are

*AFFIRMED.*

NIEMEYER, Circuit Judge, dissenting:

In my judgment, Yellow Freight was fully justified in disciplining James Hornbuckle for his late deliveries in April 1991, which was consistent with a pattern of delayed deliveries by this driver. The discipline was imposed only after warnings had been given to him about late deliveries in December 1990 and on April 9 and 12, 1991, and after he had been counseled informally for other delayed deliveries without any disciplinary action. That Hornbuckle pulled over to the side of the highway when tired and slept is to be encouraged, indeed mandated. That he is entitled, however, to avoid the consequences of discipline when he knowingly undertook trips when he was too tired to complete them leads to a misapplication, in my judgment, of the Surface Transportation Assistance Act ("STAA"), 49 U.S.C. app. §§ 2301–2305.

The STAA encourages safety on the highways by prohibiting employers from, among other things, disciplining employee drivers who refuse to operate vehicles when their ability or alertness is impaired by fatigue. The facts in this case do not support a finding that Yellow Freight disciplined Hornbuckle with any intent or motive to undermine that necessary safety requirement. The facts found by the ALJ show that Yellow Freight had in place a full array of regulations and procedures to assure driver rest that were more generous to the driver than that required by law or by Yellow Freight's collective bargaining agreement. A Yellow Freight driver could opt for ten or twelve hours between assignments, in lieu of the mandated eight hours; the driver could take a six-hour "slide" before any dispatch and, even after he received a dispatch, could take up to two hours before reporting; and the driver could take off any Monday, Tuesday, or Wednesday (days applicable here) to rest. Finally, drivers were allowed an additional hour of "grace" in the delivery of freight. In all cases, drivers were instructed that it was a firm policy of Yellow Freight that drivers not seek to take trips when they were fatigued.

Bypassing these procedures and ignoring earlier counseling with respect to them, Hornbuckle took dispatches in April 1991 when he knew he was tired, relying on his ability to get rest while on the road, and thereby delivered freight late. By this method he was able to obtain work in circumstances that violated statutory and company safety rules. He calculated that he could, and now he knows he can, avoid discipline for this breach by simply seeking refuge under the STAA. I would find that effort unavailing, as did the arbitrator who affirmed discipline when resolving a collective bargaining grievance in this case and as did the ALJ in the formal agency proceeding.

The record shows, in addition to the chronological facts described in the majority's opinion, that Hornbuckle had a history of delivering freight late. He acknowledged that he had been asked "time and time again to try to be on time"; that if he "continued to delay freight, that it was going to get [him] in trouble"; that he had been "counseled" over the months preceding April 1991 "about [his] delay of freight." The line haul manager, Mr. Sowers, testified that when he started receiving computer communications from terminals about Hornbuckle's tardiness, he called Hornbuckle in to show him the messages and to enlist Hornbuckle to set an example because Hornbuckle was the job steward. The manager reported Hornbuckle to say in response, "well, I'm tired and I'm having to take naps and my Dad told me never to get in a hurry, to take my time." When the situation did not improve, Hornbuckle was called in again and counseled about late freight. His response this time was simply, "I'm protected, I can move freight at my own pace."

Against this background, when Hornbuckle received the letters in April 1991 that are the

subject of this action, he asked Mr. Sowers to remove them from the file. Mr. Sowers justified the letters, referring Hornbuckle back to the previous occasions and conversations that the two had had about late deliveries of freight. Hornbuckle responded, "he was protected, that he was driving fatigued, that nothing could be done, that he would take it at his own pace." Hornbuckle continued, "I'm going to take on Yellow Freight, you can't make me go any faster, I'm going to run at my pace, I'll take you to court."

Relying on evidence of this type, which is repeated in the record, the late delivery in December 1990, and the three additional late deliveries in April 1991, the ALJ found as a fact:

> The respondent has established a pattern of delay of freight by the complainant. The respondent had met with the complainant and counseled him about these problems in the past.

Yet more problematical for the conclusion reached by the majority opinion is the fact that Hornbuckle fulfilled his promise of driving fatigued when he delayed freight on three occasions in April 1991. When asked whether he was aware that he was fatigued when Yellow Freight "put him on the road," Hornbuckle said that he was. He testified:

Q. And you knew that yourself?

A. Yes.

Q. That on that run, you would be fatigued?

A. Yes.

Q. But you didn't call in and take your slide before you received your dispatch, did you?

A. No, I did not.

Q. You have every right to take the six hours off to take an additional rest, and you realized that you were fatigued and you could not make that run without taking that extra break?

A. I certainly did.

Q. But you didn't do it?

A. No, I didn't.

Hornbuckle also acknowledged that he did so despite Mr. Sower's repeated instructions that Hornbuckle was obligated to get rest and not take dispatches in a fatigued state.

The ALJ thus found, in accordance with the record:

> The complainant acknowledged that by the time that he received that call, he had already realized that, if he accepted a dispatch that afternoon, he would be driving fatigued. Nevertheless, despite his recognition of his own fatigued condition he did not call the dispatcher to take the slide to which he was contractually entitled.

The violation in this case was Hornbuckle's, not Yellow Freight's. Yellow Freight did all that it virtually could to assure that drivers were rested and at the same time provide for timely deliveries for their customers. Were we to require companies such as Yellow Freight to institute additional procedures that give drivers more control in determining the schedules based on fatigue considerations, the companies could not long remain in business.

In the circumstances of this case, I believe that the ALJ had it right when he found that Yellow Freight did not violate the STAA, and that the Secretary failed in his obligation to accept the ALJ's findings of fact when supported by the record, as they are in this case. *See* 29 C.F.R. § 1978.109(c)(3). Because I would reverse the Secretary's decision, I respectfully dissent.