# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BEVERLY HOWARD CALHOUN,

*Petitioner,*

UNITED PARCEL SERVICE,
INCORPORATED,

*Intervenor,*

v.

UNITED STATES DEPARTMENT OF
LABOR,

*Respondent.*

No. 07-2157

On Petition for Review of an Order
of the United States Department of Labor.
(04-108; 2002-STA-031)

Argued: March 26, 2009

Decided: August 11, 2009

Before GREGORY and DUNCAN, Circuit Judges,
and Jackson L. KISER, Senior United States District Judge
for the Western District of Virginia, sitting by designation.

---

Affirmed by published opinion. Judge Gregory wrote the
opinion, in which Judge Duncan and Senior Judge Kiser
joined.

---

**COUNSEL**

**ARGUED:** Paul Otto Taylor, TRUCKERS JUSTICE CEN-
TER, Burnsville, Minnesota, for Petitioner. Lee Gary Grabel,
UNITED STATES DEPARTMENT OF LABOR, Washing-
ton, D.C., for Respondent. Glenn G. Patton, ALSTON &
BIRD, Atlanta, Georgia, for Intervenor. **ON BRIEF:** Gregory
F. Jacob, Solicitor of Labor, Joseph M. Woodward, Associate
Solicitor for Occupational Safety and Health, Michael P.
Doyle, Counsel for Appellate Litigation, UNITED STATES
DEPARTMENT OF LABOR, Washington, D.C., for Respon-
dent. Leslie E. Wood, ALSTON & BIRD, Atlanta, Georgia,
for Intervenor.

**OPINION**

GREGORY, Circuit Judge:

This appeal arises out of a complaint Petitioner Beverly
Calhoun filed with the Occupational Safety and Health
Administration ("OSHA") claiming that United Parcel Service
("UPS") took adverse employment actions against him as a
result of conduct protected by the Surface Transportation
Assistance Act ("STAA"), 49 U.S.C.A. § 31105 (West 2008).
An administrative law judge ("ALJ") with the Department of
Labor ("DOL") recommended a finding that UPS had disci-
plined Calhoun for engaging in STAA-protected activity, but,
in its final order, the DOL's Administrative Review Board
("ARB") found that Calhoun had not met his burden of show-
ing that UPS violated the STAA. Calhoun petitioned this
Court for review, and, for the following reasons, we affirm
the ARB's denial of Calhoun's complaint.

I.

Time is of the essence to UPS's business, which guarantees

package delivery by a certain date and, often, time. A problem at one facility, even with one driver, can create a ripple effect of delays that can seriously interfere with UPS's delivery commitments. Accordingly, UPS gives its drivers a time allowance in which to inspect their vehicles ("start-work allowance"[1]) in order to minimize delays. UPS does not discipline drivers for being over their start-work allowance ("over allowed") unless the time the driver is spending on inspections is significantly greater than that of other drivers.

Despite the time pressures incumbent on its business, UPS still has a "very positive" reputation for safety in the industry. (J.A. 627.) An expert testifying for UPS at the ALJ hearing— a former director of the Bureau of Motor Carrier Safety at the Department of Transportation ("DOT")—described UPS as "one of the leaders in safety innovation and safety investment in terms of their motor carrier operations." (J.A. 627-28.) All UPS feeder drivers[2] attend a "feeder school" that includes 40 hours of classroom training and 40 hours of on-the-job training. UPS conducts an On-Job-Supervision ("OJS") ride with every feeder driver at least once a year. And UPS prescribes pre-trip inspection methods for its drivers that have been found to "meet and exceed" the requirements of the Federal Motor Carrier Safety Regulations ("FMCSRs"). (J.A. 644.) In June 2000, DOT conducted an inspection of the UPS facility in Greensboro, North Carolina, where Calhoun works.[3] At the conclusion of the inspection, DOT inspectors found that "[a]ll of the drivers observed checked each of the necessary components thoroughly and advised that they were satisfied that the vehicles were in good working condition." (J.A. 831.)

---

[1]This is measured by the time between punching in at the beginning of the work day and leaving the yard in a loaded vehicle.

[2]Feeder drivers move packages between UPS terminals.

[3]The inspection came as the result of a complaint filed by Calhoun with the DOT, in which he alleged that UPS management was not giving drivers enough time to conduct their pre-trip inspections.

Calhoun worked for UPS as a feeder driver for over thirty years, finally retiring in December 2003. As a feeder driver, Calhoun drove double trailers from a UPS hub in Greensboro to Carnesville, Georgia, and back four days a week. In 2002, UPS recognized him with an award for his driving record of 32 years without an avoidable accident.

Calhoun filed the OSHA complaint at issue in this case on December 6, 2001. In it, he claimed that on several days between June 26 and October 31, 2001, UPS took adverse action against him as a result of activity protected under the STAA.[4] Specifically, Calhoun alleged that he was warned, suspended, and discharged for engaging in daily vehicle inspections that exceeded the UPS inspection guidelines but that he felt were necessary to comply with FMCSRs that require a driver to be satisfied with the safe operating condition of a vehicle prior to driving. At the administrative hearing before the ALJ, several of Calhoun's fellow drivers testified that they also engaged in inspection measures that exceeded those prescribed by UPS.

UPS's start-work allowance for a feeder driver operating a double trailer like Calhoun is 23.5 minutes if the trailer set comes pre-assembled and 32.5 minutes if the driver has to assemble the unit himself. In 2001, on average, UPS drivers ran about 25 minutes over the allowance. Other drivers on Calhoun's particular route were an average of 36 minutes over-allowed. Calhoun, on average, was 76 minutes over-allowed. Between January and June 2002, Calhoun's pre-trip inspection delays caused him to return more than 30 minutes late for the "Twilight Sort"[5] on 60 percent of the days he worked.

---

[4]Calhoun has filed a number of grievances with UPS under his union's collective bargaining agreement expressing his interest in being allowed to satisfy himself that his equipment was in safe operating condition before he drove.

[5]UPS needs all of its loads to be at a hub facility by twilight in order to be unloaded, processed, and moved on in time to make it to their final destinations promptly. The Twilight Sort begins at 8:00 p.m.

Over the years, UPS informed Calhoun on numerous occasions that he needed to reduce his start-work times. Nonetheless, as of January 1998, Calhoun was the most over-allowed driver at the Greensboro facility, and his times only worsened between 1998 and 2001. Calhoun's pre-trip inspection delays have both caused multiple service failures and forced UPS to take costly measures to prevent service failures. From January 2000, Calhoun was the most frequent cause of service failures at the Greensboro facility.

Calhoun's appeal requires us to determine whether on ten days between June 2001 and June 2002 Calhoun was subject to adverse employment action as a result of engaging in STAA-protected activity. The events of those days are as follows:

**June 26, 2001**: Don Allen, Calhoun's supervisor, did an OJS ride with Calhoun. Allen observed Calhoun wipe down the dash, steering wheel, gear shifter and buttons, and touch lug nuts, belts, hoses, and engine-compartment steering components. Calhoun then performed an unapproved brake test. Allen asked him to stop because such measures exceeded UPS's prescribed inspection methods and were causing delays, but Calhoun told Allen his instructions were "bullshit" (J.A. 235) and continued using his own inspection methods.

During his inspection, Calhoun found the dolly latch that controlled the trailer coupling device was not working properly. Allen initially instructed him to hook up the dolly anyway, but Calhoun took the trailer to the shop, where a mechanic found the dolly's brake drum was defective. Calhoun was given a replacement. After the OJS ride was completed, Allen prepared a report noting that Calhoun engaged in an over-exaggerated inspection of his vehicle with "no sense of urgency." (J.A. 1048.)

**June 27, 2001**: Allen again observed Calhoun's pre-trip inspection on June 27, 2001. Allen advised Calhoun that UPS

methods prescribe that air lines be checked by walking around the truck and listening and looking for leaks. Calhoun ignored Allen's instructions not to touch the air lines, and in doing so, he found two air lines that needed to be replaced because they had air bubbles in them.

**June 28, 2001**: Both Allen and shop steward Randall Williams accompanied Calhoun on his pre-trip inspection on this day. After Calhoun grabbed and twisted the steering rod, pulled on the drag link, and touched some lug nuts, Allen asked him to come back to the UPS office. There, Allen informed Calhoun that because he continued to disregard instructions he was being given another warning letter. Calhoun responded that he needed to touch the equipment "for safety" (J.A. 98) and he resumed his inspection by touching some more lug nuts and wiping off the steering wheel and gearshift lever. Allen then gave Calhoun a one-day suspension without pay. Calhoun did not drive that day.[6]

**June 29, 2001**: Allen again accompanied Calhoun on his pre-trip inspection, during which Calhoun found an air leak in the brake system. However, after Calhoun began separating a pre-assembled trailer set, Allen stopped him, and Calhoun became belligerent, stating that he wanted to check the equipment his way. As a result, Calhoun was taken out of service the next day. Calhoun apparently still drove his vehicle on June 29, although he indicated that he was "working under protest." (J.A. 108.)

**July 5, 2001**: Allen once again accompanied Calhoun on his pre-trip inspection. Calhoun turned off the air to the rear trailer in order to inspect for leaks. Allen later prepared a

---

[6]The ALJ found that Calhoun was sent home to serve his one-day suspension. The ARB, however, concluded from Calhoun's testimony at the administrative hearing that Calhoun was upset after his meeting with Allen and took himself out of service. Either way, it is undisputed that Calhoun did not operate his vehicle that day.

start-work audit in which he indicated that Calhoun had engaged in an exaggerated inspection and had unnecessarily turned off the air to the rear trailer instead of simply listening for a leak.[7]

**July 6, 2001**: Allen and union steward Thomas Hope accompanied Calhoun on his pre-trip inspection. Calhoun reported a problem with the air pressure in his brake system fluctuating significantly. After the issue was fixed, Allen hurried him through the rest of his inspection, pressuring him to get on the road despite the fact that Calhoun was not satisfied with the state of his equipment.

**July 10, 2001**: Allen again accompanied Calhoun on his pre-trip inspection and found him again to be engaged in an over-exaggerated inspection, including draining the air off the dolly, manually inspecting brake hoses, and looking under the cab door area and looking under the rear of the truck. Afterwards, Allen asked Calhoun to join him in a meeting with another supervisor, Mark Hamilton. At that meeting, Calhoun was given a three-day suspension for not scanning equipment properly. Allen indicated that Calhoun should inspect equipment with a quick, visual glance and that he needed to keep moving as he did his inspection. In a start-work audit prepared that day, Allen indicated that Calhoun was "purposely overextending" his inspections and "ha[d] not improved [his] sense of urgency about departing on schedule." (J.A. 1070.)

**September 6, 2001**: Allen and Feeder Manager Harry Wolfe met with Calhoun at the beginning of the day. At the meeting, Calhoun was asked to make a commitment to improving his start-work time and following instructions, but he refused. Allen then accompanied Calhoun on his pre-trip inspection, where Calhoun continued to manually inspect equipment and looked under the tractor cab multiple times. At

---

[7]Calhoun testified at the administrative hearing that air leaks can generally be detected audibly, unless they are minute.

one point in the inspection, Calhoun dropped to one knee and looked under the dolly to inspect the springs and brakes. In doing so, Calhoun saw a dolly brake was out of adjustment and told Allen that he wanted to take it to the UPS shop. Allen responded that "the brake test felt okay" and that Calhoun "needed to move on and go." (J.A. 135.) Calhoun left but when he got to Carnesville, GA, he felt that the brakes were not working properly, and a mechanic found that the brake parts were severely rusted. At a meeting the next day with Allen, Union Steward Williams, and Feeder Manager Wolfe, Calhoun was discharged for insubordination. In a discharge letter dated September 11, UPS cited Calhoun's September 6 conduct[8] and Calhoun's other failures to follow instructions on June 28 and July 10 as reasons for the discharge.[9]

**October 30, 2001**: Before doing his pre-trip inspection, Calhoun was given a pre-assembled trailer set to hook up. During his inspection, he proceeded to uncouple the set in order to inspect the coupling device and brakes. Allen approached and told Calhoun that he was not to separate and inspect pre-assembled doubles and that he would be terminated again if he continued to do it. On October 31, 2001, Calhoun received a discharge letter as a result of a warning letter on July 2, a July 3 one-day suspension, a July 17 three-day suspension, the September 7 notice of termination, and the October 30 failure to follow supervisor instructions.

**May 7, 2002**: Supervisors again observed Calhoun uncoupling a trailer set. Calhoun was discharged once more on May 8, 2002.

---

[8]The letter actually cites September 7, not September 6, as the day on which Calhoun committed the infractions leading to his termination. This appears to be an error, as the ALJ found that Calhoun was discharged on September 7 as a result of his conduct on September 6.

[9]UPS discharged Calhoun several times but always ultimately rehired him.

In a Recommended Decision and Order, issued on June 2, 2004, the ALJ found that Calhoun had established a prima facie case of discriminatory action by UPS on June 26, June 28, June 29, July 10, and September 6, 2001. The ALJ further found that UPS had "failed to establish that Calhoun was disciplined for legitimate, non-retaliatory reasons." (J.A. 1476.) It therefore found him entitled to back pay and compensatory damages for emotional distress. The ARB, however, declined to follow the ALJ's recommendation in its Final Decision and Order issued on September 14, 2007. The ARB found that on each of the given days on which Calhoun claimed UPS acted adversely against him, he either could not make out a prima facie case of discrimination under the STAA or could not show that the nondiscriminatory reason proffered by UPS for the adverse action was pretextual. Calhoun now petitions this Court for review of the ARB's Final Decision and Order, and UPS has been granted leave to intervene.

## II.

"Under the scheme established by Congress, the Secretary of Labor makes final determinations on Surface Transportation Assistance Act violations . . . subject to appellate court review . . . ." *Yellow Freight Sys., Inc. v. Reich* (*Yellow Freight I*), 8 F.3d 980, 984 (4th Cir. 1993) (internal citations omitted); *see also* 49 U.S.C.A. § 31105(d) (West 2008). We must sustain the Secretary's legal conclusions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Yellow Freight I*, 8 F.3d at 984 (internal quotation marks and citation omitted). While "the Secretary must adopt the ALJ's findings of fact if they are supported by substantial evidence," we must in the course of our review remain "mindful . . . of the deference due the Secretary's interpretation of a statute Congress charged him with administering." *Id.*

## III.

The STAA was passed to "promote the safe operation of commercial motor vehicles," "to minimize dangers to the

health of operators of commercial motor vehicles," and "to ensure increased compliance with traffic laws and with . . . commercial motor vehicle safety and health regulations and standards." 49 U.S.C. § 31131(a) (2006). To achieve this purpose, the STAA protects employees of commercial vehicle operators as follows:

(1) A person may not discharge an employee, or discipline or discriminate against an employee regarding pay, terms, or privileges of employment, because —

(A) (i) the employee . . . has filed a complaint or begun a proceeding related to a violation of a commercial motor vehicle safety or security regulation, standard, or order, or has testified or will testify in such a proceeding ["Complaint Clause]; or

. . .

(B) the employee refuses to operate a vehicle because ["Refusal to Drive Clause"]—

(i) the operation violates a regulation, standard, or order of the United States related to commercial motor vehicle safety, health, or security ["Actual Violation Prong"]; or

(ii) the employee has a reasonable apprehension of serious injury to the employee or the public because of the vehicle's hazardous safety or security condition ["Reasonable Apprehension Prong"]

. . . .

49 U.S.C.A. § 31105(a); *see also Brock v. Roadway Express, Inc.*, 481 U.S. 252, 255 (1987).

To prevail on a claim under § 31105(a)(1), Calhoun must establish a prima facie case that (1) he engaged in protected activity, (2) his employer took adverse employment action against him, and (3) there is a causal relationship between his protected activity and the adverse employment action. *Yellow Freight Sys., Inc. v. Reich* (*Yellow Freight II*), 27 F.3d 1133, 1138 (6th Cir. 1994). The burden then shifts to his employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *Id.* If the employer successfully rebuts the complainant's prima facie case, the complainant "bears the ultimate burden of demonstrating by a preponderance of the evidence that the legitimate reasons were a pretext for discrimination." *Id.* (internal quotation marks and citation omitted).

Calhoun argues that he can satisfy the "protected activity" element of his prima facie case under both the "Refusal to Drive Clause" and the "Complaint Clause" of § 31105(a)(1). UPS disputes that he can make out a prima facie case under either clause.

### A.

Calhoun first challenges the ARB's conclusion that his conduct on June 26, June 28, June 29, July 10, and September 6, 2001 does not constitute protected activity under the "Refusal to Drive Clause." In order to make out a prima facie case under this subsection of § 31105, Calhoun needs to show (1) that he refused to operate his vehicle (2) because either (a) operating the vehicle would constitute an actual violation of the FMCSRs, or (b) he had a reasonable apprehension that operating the vehicle would result in harm to the public or to himself. 49 U.S.C.A. § 31105(a)(1)(B). Calhoun does not argue that he can satisfy the "Reasonable Apprehension" subclause, so we do not discuss its applicability here.

Looking at the first requirement of the "Refusal to Drive Clause" — a refusal to drive—the ALJ found that "Calhoun's refusal to drive until he completed his pre-trip inspections satisfies the requirement that he refuse to drive." (J.A. 1454.) The ARB, however, found that the ALJ erred in his interpretation of the law because "Calhoun cannot seek protection under the refusal to drive clause on the days he drove his vehicle." (J.A. 1528.)

The plain language of § 31105(a)(1)(B) makes clear that to qualify for protection under the "Refusal to Drive Clause," an employee must have "refuse[d] to operate a vehicle." Thus, there was nothing arbitrary or capricious about the ARB's conclusion that Calhoun did not "refuse to drive" for purposes of § 31105(a)(1)(B) on June 29, when he drove his vehicle but indicated that he was "working under protest." (J.A. 108.) We similarly find no fault with the ARB's finding that Calhoun did not "refuse to drive" on September 6, when he drove his route despite his concerns about the dolly brake. The question of whether Calhoun's conduct on June 26, June 28, and July 10 meets the "refusal to drive" requirement of § 31105(a)(1)(B) is a closer one. On June 28, Calhoun did not operate his vehicle at all, either because he was serving a one-day suspension or because he took himself out of service. On June 26 and July 10, Calhoun did not operate his vehicle until he had completed his vehicle inspection to his satisfaction. Yet, we need not decide whether this conduct is sufficient to constitute a "refusal to drive," because we are satisfied that Calhoun still cannot make out a prima facie case under the "Refusal to Drive Clause" for these days.

With respect to June 28 and July 10, we affirm the ARB's conclusion that Calhoun did not engage in protected activity under the "Refusal to Drive Clause" because we find that Calhoun cannot satisfy the second prong of that clause: he has not shown that operating the vehicle would have resulted in an actual violation of an FMCSR.

As the ALJ noted, "Calhoun does not allege that his vehicle's condition was unsafe, and thus, a violation of any specific safety regulation." (J.A. 1457.) Instead, he argues that operating his vehicle on the days in question without completing his preferred pre-trip inspection would have violated two general FMCSRs, 49 C.F.R. §§ 392.7 and 396.13 (2008). The first of these regulations provides that "[n]o commercial motor vehicle shall be driven *unless the driver is satisfied* that the . . . parts and accessories are in good working order."[10] 49 C.F.R. § 392.7 (emphasis added). The second similarly provides that "[b]efore driving a motor vehicle, *the driver shall . . . be satisfied* that the motor vehicle is in safe operating condition." 49 C.F.R. § 396.13 (emphasis added). Calhoun claims that, although his inspection methods were more extensive than those prescribed by UPS, they were necessary to satisfy himself that his vehicle was safe to operate and therefore were necessary to comply with these two FMCSRs.

Calhoun accepts that he was not entitled to take unlimited measures to satisfy himself under the regulations but he argues that he was allowed to "take those additional measures that are *reasonably necessary* for him to assure himself that his assigned vehicles were in safe condition." (Pet'r's Br. 27 (emphasis added).) UPS does not dispute that a reasonableness standard should be applied but it argues that there is not substantial evidence on the record to support the ALJ's findings that the measures Calhoun took to satisfy himself were in fact reasonable. According to UPS, because the UPS-approved inspection measures were themselves reasonable, Calhoun had no objectively reasonable need to take the additional measures that he did.

---

[10]The regulation goes on to identify the following parts about which the driver must satisfy himself: service brakes, including trailer brake connections; parking brake; steering mechanism; lighting devices and reflectors; tires; horn; windshield wipers; mirrors; coupling devices. 49 C.F.R. § 392.7.

In *Krahn*, No. 04-097, 2006 DOL Ad. Rev. Bd. LEXIS 55, at *21-23 (ARB May 9, 2006), *pet. for review denied by*, 275 Fed. App'x 683 (9th Cir. 2008), a UPS feeder driver invoked 49 C.F.R. §§ 392.7 and 396.13 to justify his slow driving and frequent braking. *Id.* at *21. The driver, who was not allowed by his supervisor to crawl underneath his vehicle to visually inspect his brakes, claimed his driving at slow speeds and excessive braking were STAA-protected activity because he otherwise would not have been satisfied that his brakes were in good working order. *Id.* at *22-23. The ARB found that "[w]hile Krahn may have preferred crawling beneath his vehicle to visually inspect his brakes for proper adjustment, he has not established that UPS's inspection methods were unreasonable and in violation of 49 C.F.R. §§ 392.7 and 396.13." *Id.*

Similarly in *Monde*, No. 02-071, 2003 DOL Ad. Rev. Bd. LEXIS 109, at *8-9 (Oct. 31, 2003), the ARB considered a claim that complainant Monde engaged in protected activity under § 31105(a)(1)(B)(i) when he refused to drive without being allowed to complete a tire inspection every two hours or 100 miles. According to Monde, a failure to allow him to do such inspections violated 49 C.F.R. §§ 392.7 and 396.13 because, without these inspections, he could not be satisfied that his vehicle was safe to operate. *Id.* The ARB was "unable . . . to construe the general regulations as Monde urges. . . . [because it] found nothing [in the regulatory guidance] to establish the lengths to which a driver in Monde's circumstances reasonably may go to satisfy himself that his equipment is safe." *Id.* at *41-42. Meanwhile, "the record [was] replete with testimony as to Roadway's safety record and experience with blowouts." *Id.* at *42.

As *Krahn* and *Monde* persuasively suggest, where an employer's prescribed inspection methods are themselves reasonable, an employee's additional inspection measures will typically not be reasonably necessary to satisfy him that his vehicle is safe to drive under 49 C.F.R. §§ 392.7 and 396.13. This makes sense as a matter of policy. Under Calhoun's

approach, carriers and regulators would be placed in the untenable position of having to assess the reasonableness of as many different safety inspections as there are drivers. Clearly, an approach in which every driver is permitted to design his own inspection routine would seriously undermine the ability of carriers to ensure the timely delivery of packages.

Here, UPS has been found to be a leader in industry safety, and the DOT inspection of the Greensboro facility found that drivers' pre-trip inspections were thorough and that vehicles were in good operating condition. Even the ALJ found that UPS's recommended pre-trip inspection methods were reasonable. Nonetheless, the ALJ concluded that various of Calhoun's extra inspection measures—including manually checking brake hoses, lug nuts, belts, and the steering mechanism—were also reasonable. We do not necessarily disagree with this conclusion. These measures undoubtedly have the potential to detect safety-related defects that might not be discovered using UPS's prescribed visual inspection methods.

But Calhoun was not disciplined simply for using pre-trip inspection techniques beyond those prescribed by UPS. The record shows that a number of other UPS drivers used the same or similar measures to check their equipment, and UPS did not take any disciplinary action against them. What distinguishes Calhoun's conduct from that of the other drivers, and what prompted UPS to take action, was the significant delays caused by Calhoun's lengthy pre-trip inspections. The time by which Calhoun was over-allowed in his pre-trip inspection was more than double the average of the other drivers on his route, leading to numerous delays and service failures for UPS. Calhoun has not shown that the extra time he spent in his inspection regimen beyond that of other drivers made any appreciable difference in the safety of his vehicle, and thus has not shown that it was reasonably necessary to take this additional time.

Therefore, we agree with the ARB's conclusion that Calhoun cannot invoke the "Refusal to Drive Clause" to establish that he was engaged in STAA-protected activity on June 28 or July 10. UPS's prescribed pre-trip inspection methods were themselves reasonable and Calhoun cannot show that his extended inspection regimen was reasonably necessary to satisfy himself about the operating condition of his vehicle for purposes of 49 C.F.R. §§ 392.7 and 396.13.

Finally, with respect to Calhoun's conduct on June 26, the record demonstrates that Calhoun did have a specific safety concern about operating his vehicle that day, namely a malfunctioning dolly latch. But Calhoun has not shown that UPS took any adverse action against him as a result of this protected activity.[11] As a result, he has failed to establish a prima facie case under § 31105(a)(1)(B) for his conduct on this day as well.

## B.

The ARB further found that Calhoun could not make out a prima facie case under the "Complaint Clause" of § 31105(a)(1) on June 28, June 29, July 5, July 10, or October 30, 2001, or on May 7, 2002. Calhoun argues now that that this was error. We disagree. Calhoun's "complaints" do not qualify for protection under the "Complaint Clause" because they either were not communicated to his supervisors or because they did not relate to an actual violation of an FMCSR.

Section 31105(a)(1)'s "Complaint Clause" protects from retaliation an "employee . . . [who] has filed a complaint or begun a proceeding related to a violation of a commercial

---

[11]The ALJ found that Calhoun was given a one-day suspension for his conduct on June 26, but the ARB found that this was based on a misunderstanding of the testimony at the administrative hearing. After reviewing the administrative record, we agree with the ARB.

motor vehicle safety or security regulation, standard, or order." In *Yellow Freight I*, this Circuit adopted the ARB's view that internal complaints to company management, whether written or oral, suffice to satisfy the complaint requirement of § 31105(a)(1)(A)(i). *See* 8 F.3d at 986; *see also Clean Harbors Envtl. Serv., Inc. v. Herman*, 146 F.3d 12, 19 (1st Cir. 1998); *Zurenda*, 1998 DOL Ad. Rev. Bd. LEXIS 46, at *9. To qualify for protection, a complaint must be based on a "reasonable belief that the company was engaging in a violation of a motor vehicle safety regulation," *Dutkiewicz*, No. 97-090, 1997 DOL Ad. Rev. Bd. LEXIS 98, at *6 (Aug. 8, 1997), *aff'd sub nom. Clean Harbors*, 146 F.3d 12.

Calhoun does not identify any complaint, written or oral, that he made to Allen or any other supervisor on July 5 or July 10.[12] Calhoun suggests instead that he complained sub silentio on those days, by turning off air to the rear trailer on July 5 and engaging in a prolonged inspection on July 10. The ARB concluded that Calhoun's conduct on those days did not amount to a complaint for purposes of the "Complaint Clause" since "[h]e did not inform Allen or anyone else at UPS that his vehicle was unsafe or that a regulation was being violated." (J.A. 1534.) Calhoun argues that his actions can be read as complaints considered in the context of his history of oral and written complaints.

Calhoun believes that the First Circuit's review of the ARB's decision in *Dutkiewicz*, *see Clean Harbors*, 146 F.3d 12, offers support for this proposition. In that case, the employer appealed the ARB decision, arguing that there was not substantial evidence to support the ARB's finding that Dutkiewicz had "filed a complaint" for purposes of

---

[12]Moreover, Calhoun does not identify any adverse action taken against him as a result of his conduct on July 5. The record shows that the only action Allen took that day was to prepare a start-work audit, which, as the ALJ found, was not adverse action because it did not affect Calhoun's pay or promotion potential.

§ 31105(a)(1)(A)(i). *Id.* at 22. The First Circuit, however, affirmed the ARB, finding that "Dutkiewicz's oral and written complaints were sufficiently definite to put Clean Harbors on notice that he was engaging in protected activity." *Id.* It did not say or even suggest that conduct other than an oral or written complaint to a supervisor can constitute a complaint.

Still, Calhoun contends that as a matter of policy we should construe the complaint requirement of § 31105(a)(1)(A)(i) broadly. But however broadly we construe the statute, "[c]learly there is a point at which an employee's concerns and comments are too generalized and informal to constitute 'complaints' that are 'filed' with an employer within the meaning of the STAA." *Id.* Under Calhoun's interpretation of the "Complaint Clause," virtually any action he took that strayed from UPS's prescribed methods could (and should) be read as a complaint. This is clearly untenable. Even against the backdrop of Calhoun's verbal complaints on other days, his silent departures from UPS practice in his supervisor's presence do not suffice to constitute the filing of a complaint for purposes of the statute. Thus, we find nothing arbitrary or capricious about the ARB's conclusion that Calhoun did not engage in protected activity on July 5 and 10.

On the remaining days for which the ARB found that Calhoun could not satisfy the requirements of the "Complaint Clause," Calhoun has not shown that his complaints concerned actual violations of the FMCSRs. Calhoun argues first that on June 28, 2001, he made a protected complaint to a supervisor when he told Allen he needed to manually inspect the equipment on his vehicle "for safety." (J.A. 98.) The ARB found that this was not "a complaint related to a violation of a commercial motor vehicle safety regulation, standard, or order." (J.A. 1531.) Calhoun cites no specific regulation that UPS violated by not allowing him to touch his equipment. The only regulations that he points us to are, once again, the general regulations 49 C.F.R. §§ 392.7 and 396.13. Just as this did not suffice under the "Refusal to Drive Clause," it

does not suffice here. While it may have been reasonable for Calhoun to engage in some manual inspection of his vehicle's equipment, Calhoun's own lengthy inspection regimen has not been shown to be reasonably necessary to satisfy himself about the safety of his vehicle. Accordingly, Calhoun cannot use these regulations to demonstrate a "reasonable belief that the company was engaging in a violation of a motor vehicle safety regulation." *Dutkiewicz*, 1997 DOL Ad. Rev. Bd. LEXIS 98, at *6. The ARB's conclusion on this was not arbitrary, capricious, or otherwise not in accordance with the law.

On June 29 and October 30, 2001, and May 7, 2002, Calhoun complained to Allen that he wanted to be allowed to separate his pre-assembled double trailer set. Again, Calhoun's complaint to Allen did not involve a concern about violation of a specific safety regulation, nor did it concern conduct that was reasonably necessary to satisfy Calhoun about the safe operating condition of his vehicle. The record shows that other drivers only pulled apart pre-assembled doubles when they had specific concerns about them. Calhoun would disassemble them as a matter of course. Even the ALJ found that "Calhoun's decision to pull apart pre-assembled doubles without any specific reason for so doing has not been shown to be reasonable." (J.A. 1466.) Thus the ARB was justified in finding that Calhoun's complaints on these days did not amount to protected activity.

## C.

The ARB found that Calhoun did engage in protected activity under the "Complaint Clause" on four days: June 26 (complaint regarding defective dolly latch), June 27 (bulges found in air lines), July 6 (reported problem with brake system's air pressure), and September 6 (complaint regarding dolly brake). But, as the ARB notes, Calhoun has not shown that UPS took any adverse action against him as a result of his conduct on three of these days (June 26, June 27, and July 6). He does argue, though, that he was discharged on September 7 as a

result of engaging in protected activity on September 6, and the ARB's decision acknowledges that this discharge was an adverse action. Thus, Calhoun can make out a prima facie case of discrimination under the STAA for his conduct on September 6, 2001, and the burden then shifts to UPS to articulate a legitimate, non-discriminatory reason for Calhoun's discharge. *See Yellow Freight II*, 27 F.3d at 1138. To satisfy this burden, UPS points to Calhoun's insubordination on September 6, namely his refusal to commit to improving his start-work times and his continued failure to follow supervisors' instructions. With the burden shifting back to Calhoun, we affirm the ARB's finding that Calhoun has failed to demonstrate that UPS's proffered legitimate, nondiscriminatory reason was pretext for discrimination.

Calhoun's protected conduct on September 6 did not happen in isolation. Rather, it was only after refusing to improve his inspection times and in the midst of inspecting his vehicle in defiance of his supervisor's instructions, that Calhoun found the dolly brake defect and complained about it to Allen. The record establishes that it was for Calhoun's marked insubordination, and not for his protected complaint, that he was discharged on September 7. Moreover, Calhoun had a long history of insubordinate behavior—including at one point telling Allen that his efforts to reduce Calhoun's start-work time were "bullshit." In the face of Calhoun's repeated refusals to change his behavior, Calhoun's conduct on September 6 was simply the proverbial straw that broke the camel's back.

Given this history of insubordinate behavior, Calhoun cannot show that UPS's decision to discharge him on September 7 for insubordination was pretext for discrimination. We therefore affirm the ARB's conclusion that Calhoun has failed to meet his burden under the "Complaint Clause," 49 U.S.C.A. § 31105(a)(1)(A)(i), of proving that he was discharged for engaging in protected activity.

## IV.

For the foregoing reasons, we affirm the ARB's denial of Calhoun's complaint.

*AFFIRMED*