**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

No. 21-1797

───────────────

GREATWIDE DEDICATED TRANSPORT II, LLC,

　　　　　Petitioner,

　　v.

UNITED STATES DEPARTMENT OF LABOR; ADMINISTRATIVE REVIEW
BOARD; THEODORE HUANG,

　　　　　Respondents.

───────────────

On Petition for Review of an Order from the United States Department of Labor,
Administrative Review Board.  (2019-0053)

───────────────

Argued:  January 26, 2023　　　　　　　　　　Decided:  June 30, 2023

───────────────

Before GREGORY, Chief Judge, HARRIS, and QUATTLEBAUM, Circuit Judges.

───────────────

Affirmed by published opinion.  Chief Judge Gregory wrote the opinion, in which Judge Harris
and Judge Quattlebaum joined.

───────────────

**ARGUED:**  Renee Lynn Bowen, FRANKLIN & PROKOPIK, Baltimore, Maryland, for
Petitioner.　Stephanie MacInnes, UNITED STATES DEPARTMENT OF LABOR,
Washington, D.C.; Christopher Thomas Staiti, STAITI LAW FIRM, INC., Millersville,
Maryland, for Respondents.  **ON BRIEF:**  Seema Namda, Solicitor of Labor, Elena S.
Goldstein, Deputy Solicitor of Labor, Edmund Baird, Associate Solicitor for Occupational
Safety and Health, Heather R. Phillips, UNITED STATES DEPARTMENT OF LABOR,
Washington, D.C., for Respondent Secretary of Labor.

───────────────

GREGORY, Chief Judge:

While Theodore Huang was employed as a truck driver at Greatwide Dedicated Transport II, LLC ("Greatwide"), he witnessed certain drivers receive additional driving assignments in violation of 49 C.F.R. § 395.3, which regulates the maximum driving time for property-carrying vehicles. After collecting evidence related to the violations, Huang submitted anonymous letters to management reporting his findings. Soon thereafter, Huang revealed to management personnel that he was the author of the letters. The following month, Huang was assigned to deliver two trailers filled with merchandise to two Nordstrom store locations in Manhattan, New York and Paramus, New Jersey. However, when Huang returned from this assignment, he was suspended for—what Greatwide claimed to be—violations of company policy. Greatwide subsequently terminated and dismissed Huang without a more explicit explanation.

Huang promptly filed a whistleblower complaint with the U.S. Department of Labor's ("DOL") Occupational Safety and Health Administration ("OSHA"). Following several lengthy delays, the Administrative Law Judge ("ALJ") ruled in Huang's favor, ordering Greatwide to pay both backpay and emotional distress damages. The Administrative Review Board ("ARB") affirmed.

Greatwide now raises three primary arguments on appeal. First, it contends the ARB improperly affirmed the ALJ's conclusion that Huang was terminated due to his protected activity. Second, the company argues that the ARB improperly held that the company was not prejudiced by the DOL's delays in scheduling the hearing and issuing its decision and also considering Huang's disclosures beyond the predetermined deadline.

2

And third, Greatwide asserts that the ALJ erred in failing to find a valid and enforceable settlement agreement between the parties.  For the reasons that follow, we are unpersuaded by Greatwide's contentions and affirm the ARB's decision.

I.

A.

Greatwide is a commercial motor-carrier company that transports goods for its customers.  The company has approximately fifty distribution centers and employs 3,500 to 4,000 drivers.  Huang was one of those drivers, employed at the Upper Marlboro, Maryland distribution center.  Other Greatwide representatives and employees involved in this case are:  Brian Scott ("Scott"), Greatwide's regional vice president who oversees six distribution centers including the Upper Marlboro location, Aimee Price ("Price"), the regional safety director at the Upper Marlboro terminal, responsible for all OSHA, Department of Transportation ("DOT"), and Federal Motor Carrier Safety ("FMCS") compliance, and Richard Burnett ("Burnett"), a dispatcher for the Upper Marlboro terminal.

Huang alleged that two groups existed at the distribution center: "insiders" and "outsiders".  J.A. 271.  Dispatchers allowed "insiders" to drive over regulated hours in violation of 49 C.F.R. § 395.3.[1]  One day, after an "insider" informed Huang that he was

---

[1] Under this regulation, a "driver may not drive without first taking 10 consecutive hours off duty."  49 C.F.R. § 395.3(a)(1).  Nor may a driver "drive after a period of 14 consecutive hours after coming on-duty following 10 consecutive hours off-duty."  49 C.F.R. § 395.3(a)(2).  During that 14-hour period, a driver may only "drive a total of 11 hours."  49 C.F.R. § 395.3(a)(3).  Further, "driving is not permitted if more than 8 hours of (Continued)

3

going to "run"—or drive—illegally, Huang decided that he would expose the unlawful conduct and collect evidence to support his discovery.

On March 27, 2012, in order to capture discussions concerning the alleged safety violations, Huang duct-taped a digital voice recorder to a cubicle's outer wall in the distribution center's "bullpen" area,[2] and recorded the dispatcher's daily review and assignment of drivers' routes and hours. Huang deemed a brief portion of the recorded conversation relevant to the safety violations and deleted the remainder. On the same day, Huang also removed paperwork from the center's lockbox belonging to one of the "insider" drivers, Mark Peters ("Peters"). Management at the Upper Marlboro distribution center required its drivers to deposit relevant documentation, including mileage or assigned store routes, into the lockbox after returning from daily assignments. Although the parties disagree over the material and structural integrity of the lockbox, it is uncontested that the lockbox was a standard black box with a person-made slit on its top face for drivers to slip their paperwork through.

Huang alleged that he easily slipped his hand through the lockbox's opening, removed Peters' driver's log from the lockbox (which demonstrated that Peters' driving surpassed permissible hours), took the paperwork home, made copies, and returned it two hours later. The driver's log supposedly included store numbers referencing the delivery locations,

---

driving time have passed without at least a consecutive 30-minute interruption in driving status." *Id*.

[2] The record indicates that the bullpen—which was in a Nordstrom packaging warehouse—was an open floorplan area with desks and cubicle dividers. Huang alleged that the bullpen was often busy, filled with foot traffic.

4

delivery receipts and sheets, and a list of all drivers and runs. Greatwide contended that, on this day, the lockbox was mysteriously damaged. Yet, Huang never admitted to damaging the lockbox and Greatwide failed to provide evidence supporting the contrary.

On April 2, 2012, Huang sent practically identical anonymous letters to Scott and Price relaying his findings on the safety violations. Scott and Price discussed the content of the letters and pursued a company investigation. The following month, Huang confessed to Scott that he was the author of the letters and emailed him an edited mp3 file and transcription of the dispatchers' bullpen conversation related to the safety concerns.

On May 17, 2012, Huang drew an assignment to drive a double trailer to Nordstrom locations in Manhattan, New York and Paramus, New Jersey. The events surrounding this double trailer drop remain hotly contested between the parties. Huang asserts that he dropped[3] the trailer outside the Manhattan Nordstrom, secured it with a glad hand lock, and parked a 3,000-pound converter dolly in front of it, preventing any person from breaking into or stealing the trailer. While some Greatwide representatives claim Huang left that trailer in Manhattan and proceeded to complete the New Jersey assignment, Huang maintains that he brought both trailers to the New Jersey Nordstrom. Huang further contends that, in the past, he had dropped trailers in a similar fashion on the same route without issue while he grabbed a bite to eat nearby. Greatwide, on the other hand, posits that, per a Nordstrom employee's complaint, Huang dropped the trailer on a Manhattan street, off Nordstrom property,

---

[3] "Dropping" is a colloquial term used in the trucking industry to reference "disconnecting the trailer from the tractor" and leaving the trailer where it was dropped. J.A. 358.

unsecured and unlocked.  However, Greatwide could not identify the Nordstrom employee nor provide any proof of contact regarding this complaint.

Greatwide suspended Huang upon his return from the double trailer drop.  A few days later, he received notice that he was under investigation for an hours-of-service violation.  And a week after that, he was informed that he was being investigated for a security issue.

On May 30, 2012, Huang met with Price, Trian Mirov (Greatwide's Operations Manager), and Jeff Lester (Greatwide's Chief Risk Officer), to discuss his alleged conduct. The following day, Huang received an official "Termination Request" which stated— without further elaboration—that he was being terminated based on "[m]ultiple company violations." J.A. 781.

## B.

Huang filed a complaint with OSHA on September 21, 2012, alleging that Greatwide had violated the employee protection provisions found under the Surface Transportation Assistance Act ("STAA"), 49 U.S.C. § 31105, by terminating his employment in retaliation for reporting the company's safety violations.

On January 8, 2016, over three years later, the agency dismissed Huang's complaint finding that his protected activity was not a contributing factor to his termination.  Huang promptly requested a hearing before an ALJ, who subsequently calendared a hearing for September 2016 and issued notices of docketing and hearing and a pre-hearing order.  The ALJ directed the parties to provide initial disclosures, pre-hearing disclosures, and pre-

hearing statements by a particular deadline. Huang failed to provide any of this documentation prior to the hearing.

At the hearing, Huang informed the ALJ and Greatwide that his retained counsel was unable to be present. The ALJ rescheduled the hearing for June 2017, allowing the parties time to engage in potential settlement negotiations. Following the September 2016 hearing, Greatwide's counsel discovered that Huang's alleged counsel was not, in fact, formally retained and, therefore, did not represent Huang.

On October 9, 2016, Huang told the ALJ that the parties had failed to reach a settlement agreement but he was confident that would soon change. Shortly thereafter, in the course of their phone- and email-based settlement discussions, Huang left the following voicemail for Greatwide's counsel:

> Um, yeah, I think we're gunna take the offer if it's still available. Um, I noticed that in the, uh, update to the judge you put, uh, in that you intended to file for dismissal. Hopefully we won't have to go there, um, now. I, my cell phone is broken because I dropped it, so I probably can't, you know, receive any calls today. I'm gunna try to get it replaced um so hopefully we can touch base at least tomorrow . . . .

J.A. 150. In response, Greatwide's counsel wrote Huang an email confirming receipt of his voicemail and stating that: "[t]his email will confirm that you have accepted our settlement offer." J.A. 160. A week later, Greatwide's counsel followed up via email attaching a Release, Settlement, and Confidentiality Agreement for Huang's "review and signature." *Id.* The Agreement included Greatwide's understanding of the parties' agreed-upon terms as well as Greatwide's counsel's standard employment release. Huang failed to respond to either email.

7

After formally retaining counsel in May 2017, Huang eventually submitted his pre-hearing disclosures and a pre-hearing statement. Also, in a notice to Greatwide, Huang indicated that the emailed settlement agreement contained additional material terms the parties had not discussed, making the agreement an unenforceable counteroffer. Greatwide filed a motion requesting that the ALJ enforce the settlement agreement. After the ALJ refused Greatwide's request, the parties proceeded to a pre-hearing telephonic conference in June 2017. On that call, the ALJ indicated that he would grant a second continuance to the hearing if both parties agreed and informed the parties that he did not possess the equitable, Article III powers to enforce the settlement agreement.

Accordingly, Greatwide initiated a second motion for a continuance, and the hearing was rescheduled to September 2017. The company also reiterated to the ALJ that Huang failed to supplement his original pre-hearing disclosures or statement and did not provide initial disclosures, or other disclosures, as required under 29 C.F.R. § 18.50(c)(1)(i). The hearing eventually occurred in September and October 2017, where Huang, Burnett, Price, and Scott all testified.

On March 27, 2019, the ALJ issued their Decision & Order ("D&O") in Huang's favor, ordering Greatwide to pay $107,940.07 in backpay and $5,000 in emotional distress damages. The forty-five-page decision held that: (1) Huang engaged in protected activity when he wrote anonymous letters to Scott and Price, removed and copied documents from the lockbox, and recorded a management conversation to support his allegations; (2) the temporal proximity between Huang's protected activity and termination was sufficient to establish that Huang's protected activity was a contributing factor in his termination; and

8

(3) Greatwide had not established by clear and convincing evidence that it would have terminated Huang absent his protected activity. *See* J.A. 987–1033. Greatwide appealed, arguing that it was prejudiced by the DOL's delays, that the ALJ erred in considering evidence Huang failed to provide in his initial disclosures, and that the ALJ's findings were not supported by the record's substantial evidence.

In a subsequent D&O, the ARB affirmed the ALJ's decision. The ARB held first that Greatwide was not prejudiced by the ALJ's delay in issuing their D&O given its detailed analysis of conflicting testimony. Specifically, it determined that the delay was "not unreasonable." J.A. 1160. The ARB further explained that, even with these alleged "promptness violations" in mind, Greatwide failed to demonstrate that it was prejudiced by any delay because Huang's backpay was based on a limited timeline that was not impacted by any delays, and because Huang promptly filed his complaint within three months of being fired. *Id.* The ARB also agreed with the ALJ that Huang's failure to file initial disclosures was harmless given that he was not represented by counsel when they were due and that Greatwide had ample time to conduct discovery following his late submission. Next, the ARB affirmed the ALJ's finding that Huang engaged in protected activity which contributed to his termination, and that Greatwide could not show by clear and convincing evidence that it would have terminated Huang absent his protected conduct. Without much analysis, though, the ARB also *sua sponte* held that substantial evidence supported the ALJ's finding that the parties had not entered a settlement agreement. *See* J.A. 1157–1169.

9

Greatwide appeals the ARB's decision, with the same claims presented—and denied—before the ARB. In addition, the company raises a new argument concerning the ALJ's failure to enforce what Greatwide insists is a valid settlement agreement between the parties. We have jurisdiction to review these claims pursuant to 49 U.S.C. § 31105(d) and 29 C.F.R. § 1978.112.

## II.

"Under the scheme established by Congress, the Secretary of Labor makes final determinations on [STAA] violations," which are "subject to appellate court review." *Yellow Freight Sys., Inc. v. Reich*, 8 F.3d 980, 984 (4th Cir. 1993) (citations omitted).

In reviewing the Secretary's decision (which is, through delegation, the ARB's D&O), we must adhere to their "legal conclusions unless they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (internal quotation marks and citation omitted). We are also bound by the Secretary's "factual findings if they are supported by substantial evidence." *Id.* Similarly, the ARB reviews "the factual determinations of the ALJ under the substantial evidence standard." 29 C.F.R. § 1978.110(b). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). This Court must remain cognizant "of the deference due [to] the Secretary's interpretation of a statute Congress charged [them] with administering." *Calhoun v. U.S. Dep't of Lab.*, 576 F.3d 201, 208 (4th Cir. 2009) (quoting *Yellow Freight*, 8 F.3d at 984).

10

On appeal, Greatwide brings several primary claims:  (1) the ARB improperly held that substantial evidence supports that Huang could prevail on his 49 U.S.C. § 31105 claim; (2) the ARB improperly concluded that Greatwide was not prejudiced by the Secretary's or Huang's delays; and (3) the DOL erred in failing to find and enforce what the company argues to be a valid settlement agreement between the parties.  Taking each argument in turn, this Court is persuaded by the ARB's D&O and affirms on all grounds.

## III.

Congress enacted the STAA "to assist in combating the 'increasing number of deaths, injuries, and property damage due to commercial motor vehicle accidents'" on U.S. roads and freeways. *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 262 (1987) (citation omitted).  The STAA "was passed to 'promote the safe operation of commercial vehicles,' 'to minimize dangers to the health of operators of commercial motor vehicles,' and 'to ensure increased compliance with traffic laws and with . . . commercial motor vehicle safety and health regulations and standards.'"  *Calhoun*, 576 F.3d at 208 (quoting 49 U.S.C. § 31131(a)).

The STAA includes an "Employee Protections" provision which prohibits discharging, disciplining, or discriminating against an employee "regarding pay, terms, or privileges of employment, because" "the employee, or another person at the employee's request, has filed a complaint or begun a proceeding related to a violation of a commercial motor vehicle safety or security regulation, standard, or order, or has testified or will testify in such a proceeding."  49 U.S.C. § 31105(a)(1)(A)(i).

11

In 2007, Congress amended 49 U.S.C. § 31105 "to incorporate the legal burdens of proof set forth in the whistleblower provision of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, 49 U.S.C. § 42121(b)(2)(B) ('AIR 21')." *Formella v. U.S. Dep't of Lab.*, 628 F.3d 381, 389 (7th Cir. 2010); *see also* 49 U.S.C. § 31105(b) (stating that "[a]ll complaints initiated under this section shall be governed by the legal burdens of proof set forth in section 42121(b)").

Pursuant to the burdens of proof set forth in 49 U.S.C. § 42121(b),[4] complainants must present a prima facie case demonstrating by a preponderance of the evidence that: (i) they engaged in protected activity, (ii) the employer knew of the protected conduct, (iii) their employer took an unfavorable employment action against them, and (iv) the protected activity was a contributing factor to the employer's adverse employment action. *See Weatherford U.S., L.P. v. Dep't of Lab., Admin. Bd.*, 68 F.4th 1030 (6th Cir. 2023). Once established, the burden shifts to the employer to demonstrate, "by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that protected behavior." *Id.* at 1040 (cleaned up) (quoting 49 U.S.C. § 31105(b)); *see also Maverick Transp., LLC v. U.S. Dep't of Lab., Admin. Rev. Bd.*, 739 F.3d 1149, 1155 (8th Cir. 2014). This standard, as a result, is "more favorable to

---

[4] The complaint must relate to a violation of a commercial motor vehicle safety regulation. *See Ulrich, Sr., v. Swift Transp. Corp.*, 2012 WL 1143327, at *2 (U.S. Dep't. of Lab. Mar. 27, 2012).

the complaining employee." *Formella*, 628 F.3d at 389 (citing *Addis v. Dep't of Lab.*, 575 F.3d 688, 690–91 (7th Cir. 2009)).[5]

Before us, Greatwide argues that the ARB incorrectly allowed Huang to prevail on this claim. Specifically, it challenges the ARB's conclusion that there was substantial evidence to support (1) that Huang showed by a preponderance of the evidence that he engaged in protected activity, (2) that his protected activity was a contributing factor in his termination, and (3) that Greatwide failed to demonstrate by clear and convincing evidence that it would have terminated Huang absent his protected activity.

A.

We begin with whether the ARB properly affirmed the ALJ's finding that Huang "engaged in protected activity when he sent letters reporting safety violations, removed

---

[5] Relying on *Yellow Freight System, Inc. v. Reich*, 27 F.3d 1133 (6th Cir. 1994), this Court has long applied a burden-shifting analysis similar to Title VII's *McDonnell Douglas* test to claims arising under 49 U.S.C. § 31105. *See Calhoun v. U.S. Dep't of Lab.*, 576 F.3d 201, 209 (4th Cir. 2009); *Heyward v. Dep't of Lab.*, No. 21-2097, 2022 WL 17999659, at *1 (4th Cir. 2022) (per curiam) (unpublished), *Carter v. CPC Logistics, Inc.*, 800 F. App'x 196, *196–97 (4th Cir. 2020) (per curiam) (unpublished). Today, however, we take this opportunity to clarify that that standard has been laid to rest. As indicated, Congress amended the STAA in 2007 to "incorporate the burdens of proof set forth in [AIR 21]." *Weatherford*, 68 F.4th at 1040. Due to this change in the law, the standard relied upon in cases decided prior to the 2007 amendment—such as the Sixth Circuit's decision in *Yellow Freight System*—are no longer applicable. Recent Sixth Circuit precedent has indicated, and clarified, that this analysis is now "the statutorily required test." *Id.*

Thus, in looking ahead, we elucidate that the appropriate and proper legal standard in STAA allegation cases is not the *McDonnell Douglas*-styled test we historically relied upon, but rather the burdens of proof adopted by 49 U.S.C. § 42121(b)—and therefore 49 U.S.C. § 31105.

and copied documents, and recorded the dispatchers' meeting."[6]  J.A. 1164.  Finding that substantial evidence supports this conclusion, we need not disturb the ARB's decision.

1.

The ARB affirmed the ALJ's conclusion that Huang's recording of the dispatchers' bullpen meeting is protected activity.  In challenging that decision, Greatwide argues that Huang's recording was unlawful under Maryland wiretap laws and that, because Huang failed to obtain consent from the dispatchers, his actions were a punishable criminal offense.  Not so.

To start, Maryland wiretap laws require that a party demonstrate "a reasonable expectation of privacy in the intercepted oral communication." *Fearnow v. Chesapeake & Potomac Tel. Co. of Md.*, 655 A.2d 1, 16 (Md. 1995).  Under Maryland's Wiretapping and Electronic Surveillance law, protected oral communication is defined as "any conversation or words spoken to or by any person in *private* conversation."  Md. Code Ann., Cts. & Jud. Proc. § 10-401(13)(i) (emphasis added).

Substantial evidence supports the conclusion that the recorded conversation in question does not qualify as an oral communication because it was not subject to a reasonable expectation of privacy.  Huang taped the recording device outside of a cubicle wall in the distribution center's bullpen area.  This was an open space—on a warehouse floor with only cubicle dividers—that Huang and any other employee could access.

---

[6] Greatwide concedes that Huang's anonymous letters were protected activity. Opening Br. at 48.  Thus, for purposes of this analysis, we solely consider the recorded conversation and the removal and copying of Peters' driver's log.

14

Though Greatwide claims that most meetings, including confidential information, occurred in this area (and dispatchers would ask drivers passing by to leave in order to retain privacy), it cannot deny the ease of access to the space. Huang also indicated that more formal or private meetings were held in a room with a door on a different floor. At bottom, because of the evidence in the record that the managers held this meeting in an open area with little to no privacy, we find no error in the conclusion that Huang did not violate the relevant wiretap laws by recording their conversation.

Instead, "the lawful taping of conversations to obtain information about safety-related conversations is protected activity and should not subject an employee to any adverse action." *See Hoffman v. NetJets Aviation, Inc.*, 2011 WL 1247208, at *5 (A.R.B. Mar. 24, 2011). Greatwide posits that Huang "planted the recording device with the expectation and intention of recording conversations related to which Nordstrom 'stores need[ed] which product and when' and the routes that would be assigned based on that need, not safety violations." Opening Br. at 41 (citation omitted). In other words, Greatwide believes Huang had no intent to record this management conversation in an effort to gather information for the safety violation complaint, but rather, to access confidential information. This argument fails.

Let's consider the events surrounding the recorded conversation. On the same day Huang set up the recorder, he also borrowed documentation from the lockbox belonging to Peters, one of the "insider" drivers. The fact that these two events occurred on the same day lends significant credibility to Huang's narrative: he did all this to gather proof that individuals at the distribution center were participating in safety violations.

Even more, Huang was aware that this was the designated time when dispatchers assigned driving routes. Although the conversation took place over a couple of hours, Huang testified that he only sent a roughly three-and-a-half-minute portion to Scott—which focused on what Huang claims was relevant discussion of the alleged safety violations—and deleted the remainder of the recording. These facts provide substantial evidence that Huang's recording of the dispatchers' conversation was protected activity.[7]

2.

Substantial evidence also supports the ALJ's finding that Huang engaged in protected activity when he removed—and subsequently photocopied—an "insider" driver's paperwork from the distribution center's lockbox.

After removing documents from the lockbox, Huang discovered that the driver's log submitted by one of the "insider" drivers—Peters—demonstrated driving hours beyond the permissible maximum. Huang brought Peters' driver's log home, photocopied it, and returned it to the lockbox two hours later. When Huang sent his anonymous letters to Price and Scott, he attached the photocopied driver's log as relevant evidence to support his discovery.

---

[7] Greatwide's reliance on *Hoffman*, 2011 WL 1247208, is misplaced. There, the ARB determined that the employer reasonably suspected that some of the complainant's recordings were not protected activity because the complainant recorded approximately 750 conversations over the course of almost two years. *Id.* at *5. The facts before us paint a contrasting picture. Huang recorded just one conversation between the dispatchers on a particular morning because he was aware that they would likely discuss the unlawful extended driving hours. As the ARB stated in *Mosbaugh v. Georgia Power Co.*, Nos. 1991-ERA-001, -011, slip op. at 7–8 (Sec'y Nov. 20, 1995), "tape recording to gather evidence of activities that are protected under the whistleblower statutes is [] protected." And that is exactly the course of action Huang pursued. This conclusion is bolstered by Huang's decision to edit the mp3 file to a three-and-a-half-minute recording that focused on the safety-related concerns and dispose of the remainder.

16

Greatwide insists that Huang's conduct is not protected activity because the documents in the lockbox were confidential under company policy. This argument is unavailing. The company's "Confidential Information" policy states that "[c]ustomer data, employee data, capacity data pricing and marketing or strategic plans are examples of Greatwide's confidential information." J.A. 710. The company's handbook does not classify drivers' logs as confidential information or "employee data." In fact, the handbook fails to mention drivers' logs altogether.

Regardless of the company's policy, Huang's sole intent in collecting and copying Peters' driver's log was to support his safety violation allegations. Thus, his actions rise to the level of protected activity. *See Franchini v. Argonne Nat'l Lab.*, 2015 WL 5781072, at *9 (A.R.B. Sept. 28, 2015) (determining that complainant's recordings during his employment constituted protected activity under the Energy Reorganization Act "because he anticipated using the recordings in seeking resolution of problems he had identified").

For these reasons, we conclude that Huang's borrowing and photocopying of Peters' driver's log constitutes protected activity.[8]

B.

Because Greatwide does not contest its knowledge of Huang's protected conduct nor that its decision to terminate Huang was an adverse employment action, we continue

---

[8] Greatwide also turns to *BSP Trans, Inc. v. U.S. Dep't of Labor*, 160 F.3d 38 (1st Cir. 1998), for support. But, like the ARB, we find *BSP Trans* distinguishable because the complainant there failed to ever submit a complaint alleging an STAA allegation. *Id.* at 48–49. That is wholly different from the case at bar, where Huang's STAA allegation is the foundation of these proceedings.

17

to the next step in the test: whether Huang's protected activity was a contributing factor in Greatwide's decision to terminate. We deem that it was.

A contributing factor is "any factor which, alone or in combination with other factors, tends to affect in any way the outcome of the [adverse personnel] decision." *Beatty v. Inman Trucking Mgmt., Inc.*, 2014 WL 2917587, at *5 (A.R.B. May 13, 2014). This step is viewed as "broad and forgiving"; when introduced, it was "intended to overrule existing case law [that] require[d] a whistleblower to prove that his protected conduct was a 'significant', 'motivating', 'substantial', or 'predominant' factor in a personnel action in order to overturn that action." *Feldman v. L. Enf't Assoc. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014) (citation omitted) (quoting *Marano v. Dep't of Just.*, 2 F.3d 1137, 1140 (Fed. Cir. 1993)).

"Temporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation." *Id.* (quoting *Tice v. Bristol-Meyers Squibb Co.*, 2006 WL 3246825, at *20 (A.L.J. Apr. 26, 2006)). The closer the temporal proximity between the protected activity and the adverse employment action, the stronger the inference of a causal connection becomes. *Warren v. Custom Organics*, 2012 WL 759335, at *8 (A.R.B. Feb. 29, 2012).

The temporal proximity between Huang's protected activity and his termination is a vital part of this analysis. Huang sent the anonymous letters to Scott and Price on April 2, 2012. He disclosed to Scott that he was the author of the letters on May 14, 2012. He was suspended on May 18, 2012, the day he completed the double trailer drop to Manhattan and New Jersey, and was officially terminated on May 31, 2012. These events all occurred in just under two months. *See id.* at *9 (collecting cases demonstrating temporal proximity

18

between thirty days and eight months establishes causation nexus). Yet, although integral, temporal proximity is "not necessarily dispositive," but rather a piece of "evidence for the trier of fact to weigh in deciding the ultimate question of whether a complainant has prove[n] by a preponderance of the evidence that retaliation was a motivating factor in the adverse action." *Clemmons v. Ameristar Airways, Inc.*, ARB No. 08-067, ALJ No. 2004-AIR-011, slip op. at 6 (A.R.B. May 26, 2010) (quoting *Dixon v. U.S. Dep't of Interior*, ARB Nos. 06-147, -160, ALJ No. 2005-SDW-008, slip op. at 13 (A.R.B. Aug. 28, 2008)).

Greatwide contends that the ARB erred in affirming the ALJ's determination "that Huang's protected activity was a contributing factor in his termination solely on the temporal proximity" of Huang reporting safety violations and his termination. Opening Br. at 52. However, the ARB noted in their opinion that temporal proximity and Greatwide's knowledge of Huang's protected activity were not sufficient to establish that Huang's protected activity contributed to his termination. Rather, the ARB took into consideration additional facts demonstrating that Huang's protected activity contributed to his firing—most notably, that Greatwide admitted that it fired Huang in part because he removed and copied documents and recorded employee conversations. *Id.*

These facts—taken in tandem with the temporal proximity and employer knowledge—are sufficient to establish that Huang's protected activity was a contributing factor to his termination. First, for reasons indicated above, the record's substantial evidence clearly indicates that recording the dispatcher's conversation and borrowing and photocopying Peters' driver's log were protected activities Huang relied upon to support his report alleging safety violations. To boot, Greatwide asserts that Huang would have

19

independently been fired for each of the questioned behaviors discussed herein.  But that argument proves too much.  Because some of those actions are, indeed, protected activity, Greatwide in essence concedes that it would have fired Huang for engaging in activity that is safeguarded by federal law.  Huang, once again, prevails.

C.

The burden now shifts to Greatwide to show, by clear and convincing evidence, that Huang would have been terminated absent his protected activity.  In accordance with the ARB, we conclude that the record's substantial evidence demonstrates Greatwide's failure to make such a showing.

1.

The ARB held that Greatwide failed to prove by clear and convincing evidence that Huang damaged the lockbox and committed an infraction during the double trailer incident and, assuming the truth of those allegations, that Greatwide would have terminated Huang for either incident.  We agree.

First, the lockbox.  As indicated above, the events surrounding the lockbox's damage remain in dispute.  Huang testified that he had not observed any damage to the lockbox and that he was able to retrieve the relevant paperwork by reaching his entire hand through the existing opening on the top.  J.A. 279.  By contrast, Burnett indicated at the hearing that the damage "looked like a hammer or a maul hammer . . . punched a hole in the side or the side of the lid, about the size of maybe a softball."  J.A. 432.  Price, on the other hand, claimed that the damage had been "to the actual slit of the lockbox."  J.A. 490.  Moreover, Greatwide asserts that Huang confessed to damaging the lockbox prior to his termination.  But, beyond

20

Burnett and Price's inconsistent testimony, Greatwide has failed to submit any corroborating evidence of the lockbox's alleged damage or Huang's alleged confession.

Further, Greatwide's Employee Handbook does not provide explicit guidance on why this alleged violation would result in termination. Among a non-exhaustive list of thirty examples, the Handbook's "Rules of Conduct" section states that "willful destruction of Company property" is a serious policy violation which is grounds for "disciplinary actions *ranging from a verbal warning to immediate termination of employment*." J.A. 707 (emphasis added). Given the broad range of possible disciplinary grounds, and Greatwide's failure to demonstrate that the destruction of comparable company property typically leads to termination, the company has not met the clear and convincing evidence standard that this specific "serious policy violation" would have resulted in Huang's termination.

Next, we consider the double trailer incident. Greatwide contends that Huang allegedly "leaving a trailer unattended on a public street in violation of Greatwide policy . . . is [] a legal, legitimate, and independent basis for termination." Opening Br. at 46. It also insists that whether Huang actually left the trailer is immaterial because he confessed to Greatwide officials that he had committed this act and had done the same on previous occasions. But, like the lockbox's alleged damage, the circumstances surrounding the double trailer drop continue to evade clarity.

Huang testified that during this assignment, he first went to the Manhattan Nordstrom, where he dropped one trailer on a street, secured it with a glad hand lock, and placed a parked convertor dolly in front of it, while the store unloaded the other trailer. He specified that he never left the dropped trailer in Manhattan to attend to the second delivery

21

in New Jersey and he instead brought both trailers with him to the New Jersey job. Huang also indicated in his letter that, on multiple previous occasions, he had parked a trailer unit at this Manhattan Nordstrom and went "out to the corner to buy food" without any security issues. J.A. 535.

In stark contrast, Burnett testified that Huang dropped one trailer on a Manhattan street leaving it "unattended, unlit and unlocked" while he continued on to the second store. J.A. 439. A Nordstrom product receiver then called Greatwide, notifying the company of the trailer's location. Price testified next, stating that Huang had left the trailer unsecured on a Manhattan street and not on Nordstrom property. After learning of the incident, Price said she confronted Huang, and that he told her that "he felt it wasn't a big deal since he had done it before." J.A. 494. This, she asserted, was itself grounds for termination. Finally, in his testimony, Scott asserted that a trailer "was dropped on a public street in Manhattan . . . Huang then left and drove to New Jersey with another trailer and left the trailer unattended for that amount of time." J.A. 579. Scott also stated that he communicated via email with Nordstrom staff concerning the location of the dropped trailer.

This testimony notwithstanding, the record does not illustrate by clear and convincing evidence that Huang dropped an unlocked trailer on a Manhattan street to complete the New Jersey delivery. Apart from Huang's denial, Burnett, Price, and Scott's testimonies were not consistent, particularly with regards to whether Huang left the trailer unattended. Was it only briefly unattended for him to grab food, or did he leave the trailer and Manhattan altogether en route to the New Jersey Nordstrom? The record does not point us to a clear and convincing answer. Moreover, there is no record evidence

22

documenting a complaint from Nordstrom staff nor any proof of the email exchange between Scott and relevant Nordstrom personnel.

Notably, the Handbook is also silent on rules governing trailer dropping and any related disciplinary conduct. Price testified that she assumed there was a policy memorialized in the handbook concerning trailer abandonment, but "[i]f not, it would be something that would be orally passed out at a safety meeting." J.A. 546. Again, the record does not corroborate this statement. Price also admitted that she was not aware of a separate employee handbook specific to Nordstrom.

During his testimony, Scott stated that when new policies are added, they are "normally" written down and handed to the drivers, then eventually they are supplemented into the Employee Handbook. J.A. 563. He recounted that unattended trailer incidents had happened in the past with other employees, which led the company to establish a Nordstrom-specific policy. However, the record does not include—nor discuss—a separate addendum or specific company policy related to Nordstrom drops for which drivers were put on notice. Importantly, Scott did not reveal whether those past employees who left trailers unattended faced immediate termination or other disciplinary measures. Because the record is devoid of the Nordstrom-related policy Greatwide claims to have implemented, we cannot determine that the company would have fired Huang for the alleged Nordstrom trailer drop incident.

As a result, Greatwide has not adduced clear and convincing evidence that Huang committed these acts, and even if he had, that the company *would* have fired Huang absent his protected activity.

23

2.

Finally, we grapple with Greatwide's failure to provide Huang with a consistent termination explanation.  On January 26, 2017, Greatwide's Vice President and General Counsel, Jeffrey Stupp, submitted an affidavit claiming that Huang was terminated for "breaking into the lockbox, stealing its contents, and secretly recording Greatwide's management's telephone conversations *and not due to any other reason*."  J.A. 51 (emphasis added).  However, at the official hearing, Price and Scott offered conflicting explanations:  Price testified that Huang was terminated for damaging company property and dumping an unsecured trailer in Manhattan while Scott stated that Huang was fired for recording management's conversation, destroying company property, dropping a trailer, and removing relevant paperwork from the company's lockbox.  Huang was also told, on one occasion prior to his termination, that he was being investigated for violation of company policies.  But his termination letter was devoid of any official reason for the company's decision.  These contradictions alone do enough damage to undermine Greatwide's capacity to overcome this step.

Because we agree with the ARB that Greatwide has failed to meet its burden, our analysis ends here.  Thus, Huang has successfully demonstrated an STAA allegation.

IV.

Like the ARB, we, too, reject Greatwide's position that it was prejudiced by the delays in the hearing process.  The ALJ's delay in issuing their D&O more than 120 days after the hearing was not unreasonable given its detailed analysis of conflicting testimonies.  Also,

24

Huang's backpay was based on a limited timeline, unimpacted by the delays. J.A. 1160–61. Greatwide argues that these findings were improper given the record before the ARB. Although we acknowledge that there were several delays on behalf of the DOL, we, ultimately, conclude that the record does not support Greatwide's contentions that it was prejudiced.

Under the STAA, the Secretary of Labor shall conduct an investigation, determine whether a complaint has merit, and notify the person alleged to have committed the violation and the complainant of the findings—in writing—no later than sixty days after receiving the complaint. 49 U.S.C. § 31105(b)(2)(A). If the Secretary decides it is reasonable to believe that a violation has occurred, they will issue a decision with their findings and a preliminary order for relief. *Id*. Following this decision, the complainant and the person accused of committing the violation has thirty days to object to the Secretary's findings and/or preliminary order and request a hearing. 49 U.S.C. § 31105(b)(2)(B). That "hearing shall be conducted *expeditiously*" with the Secretary issuing their final order "[n]ot later than 120 days after the end of the hearing." 49 U.S.C. § 31105(b)(2)(C) (emphasis added).

Yes, it is undisputed that there were several lengthy delays that occurred at different stages of this adjudicative process, resulting in the ALJ's issuing their D&O over six years after Huang first promptly filed his complaint. Although we sympathize with Greatwide's frustration, there are instances where—as here—such delays do not amount to prejudice or unreasonableness given the significant bandwidth the ALJ undertook to issue their D&O.

For support, we turn to the ARB's reliance on our holding in *Trans Fleet Enterprises, Inc. v. Boone*, 987 F.2d 1000 (4th Cir. 1992). There, Trans Fleet Enterprises

25

argued that the ALJ violated the agency's own law requiring a decision within thirty days following the hearing when the ALJ issued their decision almost a year after the hearing. *Id.* at 1004. However, this Court held that the delay was not unreasonable because the "ALJ had to consider sharply-conflicting testimony, and the result was a lengthy and well-reasoned decision." *Id.*

We find ourselves in a similar position here. Like the ALJ in *Trans Fleet*, the ALJ before us was presented, and duly grappled, with deeply conflicting testimonies from a handful of witnesses: Huang, Burnett, Price, and Scott. To illustrate the case's complexity, take the witnesses' testimonies surrounding the lockbox incident. The ALJ considered and discussed, at length, the examination of each witness, concerning their differing opinions on the structural integrity and description of the lockbox, whether it was damaged, where the damage was on the lockbox, whether a person could fit their hand easily into it, and whether the lockbox contained confidential driver information. This level of analysis was not isolated to the lockbox incident, but was accorded to each piece of testimony. The ALJ's in-depth D&O was presented in an extensive, forty-five-page decision, which spared no minor detail. Given their attention afforded to the facts of this case, we do not hold that the ALJ's delay was unreasonable nor was Greatwide prejudiced by such.

Greatwide also asserts that it was prejudiced by the delay between the parties' objections to the Secretary's issuance of findings and the evidentiary hearing. Per 49 U.S.C. § 31105(b)(2)(C), "[a] hearing shall be conducted *expeditiously*" (emphasis added), following the filing of objections. The record clearly demonstrates that, though the hearing did not take place until September 2017—over a year after the objections were filed—the

26

ALJ attempted to ensure the hearing proceeded with due haste. *See* J.A. 172 (ALJ stating that "absent both parties agreeing to [a continuance of the hearing], given that this case has been around for so long, given that the reason for the extended delay was Mr. Huang's conduct, I'm not going to continue the hearing unless both of you agree"). However, the ALJ found it necessary to reschedule the hearing on two occasions: first, when Huang believed he had retained counsel, but actually had not and, second, when both parties agreed to reschedule given Huang's new discovery requests and the parties' efforts to achieve a settlement. We do not believe that these delays were prejudicial to Greatwide.

However, we face a rockier path regarding the initial delay between Huang's filed complaint and the Secretary's issuance of findings. As noted, Huang filed his complaint in September 2012, shortly after his termination, and the Secretary did not issue their initial findings until January 2016, completely bypassing the sixty-day statutory time limit. The DOL's briefing fails to address this issue explicitly and, at oral argument, counsel boiled the delay down to staff deficiencies. Oral Argument at 43:03–59. Greatwide contends that this delay, among the others, stymied its ability to prepare a defense. The company specifically asserts that during the period of time between Huang's filed complaint and the evidentiary hearing, it "experienced changes in personnel, changes in document management systems, loss of and inability to locate witnesses, and faded memories of those witnesses who were able to testify at the hearing." Opening Br. at 30–31. Although this delay is substantial, Greatwide's argument lacks merit. As the ARB noted, Greatwide should have taken appropriate steps to preserve relevant evidence, such as witness testimonies and statements, the moment Huang timely filed his whistleblower complaint

27

back in 2012.  If these steps were properly pursued, the relevant information Greatwide

claims to have lost would have withstood this lapse in time.  Greatwide cannot argue that

they were prejudiced by their failure to act.

Even so, we would be remiss not to acknowledge that circumstances may arise

where an employer is prejudiced by vast DOL delays.  We do not explore the extent of

those instances today.  But even though "statutory time limits for agency action are usually

deemed directory," *Trans Fleet*, 987 F.2d at 1005, and not mandatory, we urge the agency

to seek courses of action to avoid similarly prolonged delays in the future and to mitigate

concerns regarding "the inordinate amount of time involved in STAA actions."  *Roadway*

*Express, Inc. v. Dole*, 929 F.2d 1060, 1067 (5th Cir. 1991) (citing *Brock*, 481 U.S. at 270–

71 (Brennan, J., concurring in part and dissenting in part)).

Thus, with recognition of certain lengthy delays, we nonetheless conclude that

Greatwide was not prejudiced.[9]

---

[9] Greatwide further posits that the ARB improperly found that Huang's failure to file his initial disclosures was harmless.  We disagree.  A party must—without waiting for a discovery request—provide the other parties relevant information of each individual likely to have discoverable information which the disclosing party may use to support its claims or defenses; a copy or description of all documents, virtually stored information, or tangible items that the disclosing party has in its possession or control that it may use to support its claims or defenses; and a computation of each category of damages claimed by the disclosing party.  *See* 29 C.F.R. § 18.50(c)(1)(i).  If a party fails to provide this information, it is not permitted to utilize that information to supply evidence on a motion or at a hearing, unless the failure was harmless or substantially justified.  *See* 29 C.F.R. § 18.57(c).  However, as the ALJ noted in a pre-hearing conference call, "the ARB takes a more paternalistic approach towards pro se complainants than federal courts do." J.A. 171. Meaning, those "who proceed pro se are afforded more leeway in an administrative context than in a judicial one." *Highland Town Sch. Corp. v. Rev. Bd. of Ind. Dept. of Workforce* (Continued)

V.

Finally, we briefly consider Greatwide's request for us to enforce what the company posits is a valid settlement agreement between the parties.  We decline to accept this invitation.

At a pre-hearing telephonic conference, the ALJ determined that he was unable to enforce the settlement agreement because he lacked the equitable powers to do so.  Later, during the official hearing, Greatwide's counsel attempted to raise the settlement agreement for a second time.  The ALJ firmly reiterated that he would not "make any findings as to whether there was an agreement."  J.A. 398.

Greatwide failed to raise its settlement agreement argument before the ARB.  But in analyzing Greatwide's arguments concerning the proceeding's delays, the ARB stated that "substantial evidence supports the ALJ's finding that the parties did not enter into a settlement agreement."  J.A. 1161.  Before us at oral argument, Greatwide's counsel conceded that it failed to challenge the ALJ's decision not to enforce the settlement agreement before the ARB.  However, Greatwide's counsel insisted that its claim could be addressed by this Court because the ARB's D&O briefly addressed the alleged settlement agreement.  Oral Argument at 2:37–3:34.

While we agree with Greatwide that the ARB's D&O did *sua sponte* mention the settlement agreement in passing, we nonetheless conclude that this argument was not properly raised and argued before the ARB.  A "party desiring to seek review, including

---

*Dev.*, 892 N.E.2d 652, 656 (Ind. Ct. App. 2008).  Thus, we see no grounds for disrupting the ARB's finding that Huang's failure was harmless as the raised conduct occurred while he was unrepresented by counsel.

29

judicial review, of a decision of the ALJ must file a written petition for review with the ARB. The parties should identify in their petitions for review the . . . orders to which they object, *or the objections may be deemed waived.*" 29 C.F.R. § 1978.110(a) (emphasis added).

Therefore, Greatwide has failed to preserve the settlement agreement claim and we decline to address its validity and enforcement. *See Welch v. Chao*, 536 F.3d 269, 279 (4th Cir. 2008) (concluding that appellant had forfeited "new arguments by failing to raise them before the ARB"); *Taylor v. U.S. Dep't. of Lab.*, 440 F.3d 1, 8 (1st Cir. 2005) (noting that appellants forfeited their argument "by failing to raise it during the administrative proceedings").

VI.

We conclude that Huang has prevailed under his STAA claim. Substantial evidence supports the ARB's conclusion that Huang engaged in protected activity, that his activity was a contributing factor in his termination, and that Greatwide failed to prove by clear and convincing evidence that Huang would have been terminated absent his protected conduct. Nor was Greatwide prejudiced by the proceeding's delays. Finally, we decline to enforce the alleged settlement agreement because the company failed to challenge the ALJ's decision before the ARB. For these reasons, the ARB's D&O is thereby

*AFFIRMED*.